SIXTH DIVISION
December 17, 2010

No. 1-08-3654

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 00 CR 16875 (01) |
| | ) | |
| WILLIE HAMPTON, | ) | Honorable |
| | ) | Michael Brown, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CAHILL delivered the opinion of the court:

Following a bench trial in 2002, defendant Willie Hampton was convicted of eight counts of aggravated criminal sexual assault with a firearm (720 ILCS 5/12-14(a)(4), (a)(8) (West 2002)) and two counts of home invasion with a firearm (720 ILCS 5/12-11(a)(3) (West 2002)) and sentenced to 84 years in prison. On appeal, we remanded the case and ordered the trial court to conduct a forfeiture by wrongdoing hearing and grant a new trial if defendant did not forfeit his confrontation rights. People v. Hampton, 363 Ill. App. 3d 293, 301, 842 N.E.2d 1124 (2006). We also vacated four of defendant's convictions for aggravated criminal sexual assault and one count of home invasion and found that sentencing enhancements added to the aggravated criminal sexual assault convictions violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, §11). Hampton, 363 Ill. App. 3d at 309-10. The State filed a petition for leave to appeal with the Illinois Supreme Court to contest our ruling on the sentencing

enhancements issue. The supreme court found we prematurely considered the constitutionality of the sentencing enhancements, vacated the portions of our opinion addressing that issue and remanded this cause to the trial court for an evidentiary hearing on forfeiture by wrongdoing. People v. Hampton, 225 Ill. 2d 238, 245, 867 N.E.2d 957 (2007). On remand, the trial court found defendant forfeited his right to confront a witness against him and reinstated his convictions and 84-year prison sentence.

On appeal, defendant contends that: (1) the State failed to establish he forfeited his right to confront a witness against him at trial; (2) the 15-year enhancements added to four of defendant's aggravated criminal sexual assault convictions violate the proportionate penalties clause of the Illinois constitution; (3) one of defendant's convictions for home invasion must be vacated because both convictions rest on the same illegal entry into the victims' home on June 21, 2000; and (4) four of defendant's eight convictions and sentences for aggravated criminal sexual assault must be vacated where the evidence showed there were four acts of sexual penetration. The State contests the first issue but concedes the last three points. We now affirm the trial court's forfeiture ruling, and in accord with the State's concessions, we vacate one home invasion conviction, vacate four aggravated criminal sexual assault convictions and remand for resentencing on the four remaining criminal sexual assault convictions.

The evidence at trial established that defendant, codefendant Cory Durr and an unknown male illegally entered Y.N.'s home in Chicago at 3 a.m. on June 21, 2000. Defendant and the unknown male raped Y.N. then fled to a house located at 6450 South Hoyne Avenue. Shortly after, defendant, Durr and Maurice Alexander were arrested at that location.

The State called Durr to testify. Durr was serving an eight-year prison term after pleading guilty to charges relating to this case. Durr invoked his fifth amendment right against self-incrimination and refused to answer questions relating to the crime. The trial court told Durr he had no fifth amendment right under the circumstances and could be held in contempt of court if he refused to answer the State's questions. Durr still refused to talk about the crime but admitted giving a handwritten statement to an assistant State's Attorney on June 22, 2000.

The State moved to admit Durr's statement under section 115-10.2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.2 (West 2000) (allowing, in limited circumstances, hearsay statement of a witness who refuses to testify despite court order to do so)). Defendant objected on the ground that the statement violated his right to confront the witness. The court admitted the statement, which was then read into evidence.

Durr said the following in his statement to the assistant State's Attorney. Durr met defendant and Maurice Alexander in the early morning hours of June 21, 2000. Defendant told Durr that he and Alexander were on their way to "break into a house and go steal some money." Durr decided to go along. All three men went to defendant's house at 6450 South Hoyne Avenue to pick up guns. They then walked to Y.N.'s house. Defendant told Durr to stand on the back porch of Y.N.'s house and watch for police. After about two or three minutes, defendant opened the back door from inside the house and let Durr inside. Durr stood in the kitchen while defendant yelled at Y.N., demanding that she give him money. After about 10 or 15 minutes, Durr walked into the living room. Durr saw defendant and Alexander "tearing up the room looking for money." Alexander told Durr to go back into the kitchen and continue looking out

3

for the police. Durr heard someone coming upstairs from the basement. Defendant came into the kitchen, pulled his gun out and ordered the man who came from the basement to lie on the floor. Durr stayed in the kitchen for another 15 minutes. He then went into Y.N.'s bedroom. Durr saw defendant and Alexander sexually assault Y.N. He then went back into the kitchen. Defendant and Alexander came "charging towards the door" approximately 5 to 10 minutes later. All three men left Y.N.'s house and ran to defendant's house.

Following closing argument, the trial court found defendant guilty on all counts. The court said it "particularly found persuasive the statements of Mr. Cory Durr in that his statements were consistent with the testimony of the victim in this case." The court gave "very little weight" to the defense witnesses who testified they heard Y.N. tell police that defendant was not involved in the crime.

Defendant was convicted of eight counts of aggravated criminal sexual assault with a firearm (720 ILCS 5/12-14(a)(4), (a)(8) (West 2002)) and two counts of home invasion with a firearm (720 ILCS 5/12-11(a)(3) (West 2002)). The court sentenced defendant to 21 years on four counts of aggravated criminal sexual assault, to run consecutively, for a total of 84 years in prison. Defendant was sentenced to 21 years in prison for each of the home invasion counts, to run concurrently with the other sentences. Defendant was also sentenced to six years on the remaining four counts of aggravated criminal sexual assault, also to run concurrently with the other sentences.

On direct appeal, among other claims, defendant contended that under Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), his sixth amendment right

to confrontation (U.S. Const., amend VI) was violated when Durr's statement was admitted into evidence. Hampton, 363 Ill. App. 3d at 300. The State agreed that there had been a Crawford violation but argued that defendant forfeited his right to assert a confrontation clause challenge because he wrongly procured Durr's silence. Hampton, 363 Ill. App. 3d at 300. We vacated and remanded this case to the trial court "for an evidentiary hearing on the State's forfeiture-by-wrongdoing claim." Hampton, 363 Ill. App. 3d at 301. We held that if defendant were found not to have forfeited his right of confrontation, he would be entitled to a new trial. Hampton, 363 Ill. App. 3d at 301. We also vacated defendant's four convictions for aggravated criminal sexual assault and one count of home invasion and found that the 15-year firearm enhancements added to each of defendant's aggravated criminal sexual assault convictions were unconstitutional under the proportionate penalties clause. Hampton, 363 Ill. App. 3d at 309-10.

The State petitioned the Illinois Supreme Court for leave to appeal our finding that the 15-year add-on for aggravated criminal sexual assault was unconstitutional. Hampton, 225 Ill. 2d at 240. The supreme court granted the appeal, found we prematurely considered the constitutionality of the 15-year firearm add-on and vacated the portions of our opinion addressing issues other than the forfeiture by wrongdoing. Hampton, 225 Ill. 2d at 245. The supreme court remanded this case to the trial court for an evidentiary hearing on whether defendant forfeited his right to assert a confrontation clause challenge by wrongdoing. Hampton, 225 Ill. 2d at 245.

On remand, the following evidence was presented at the evidentiary hearing.

Officer Travis Armstead testified that he was acting as lockup keeper on January 1, 1997, when he came into contact with defendant as part of his duties. Defendant listed his mother,

Francine Hampton, as a contact person while being processed.

Officer David Stock testified that he was working in the intelligence unit at the Centralia Correctional Center on July 2, 2002. Stock was informed by a mail room employee of a suspicious letter. The letter was addressed to inmate Cory Durr with a return address of "guess who?" and signed by "Black." After investigating, Stock learned that defendant, with the nickname of "Black," was a codefendant in Durr's case. The letter directed Durr on how to testify, and Stock believed "it was communication that should not be taking place." Stock contacted his supervisor and forwarded the letter to the Cook County State's Attorney's office on July 12, 2002. Durr never saw the letter.

After the letter was mailed, Stock began reviewing phone conversations between Durr and defendant's mother, Francine Hampton, recorded on Centralia's phone system. Stock transferred some of the conversations onto cassette tapes and sent them to Assistant State's Attorney Lawrence O'Reilly, who was prosecuting defendant's case.

In August 2002, when Durr returned from testifying in defendant's case, Durr saw Stock and said "[y]ou don't play fair, Stock."

Nicholas Richert, a DNA expert for the Illinois State Police, testified that defendant's DNA matched that found on the flap of the envelope sent to Durr.

The State entered into evidence defendant's birth certificate showing his mother to be Francine Powell and his father to be Willie Hampton and phone records showing that the phone number dialed by Durr was registered to Francine Hampton.

The State entered into evidence a transcript of Durr's testimony from the hearing of

6

People v. Francine Hampton, 02 CR 19850 (Cir. Ct. Cook Co.) on July 7, 2004. Francine was charged with suborning perjury and communicating with Durr in connection to defendant's trial but found not guilty. Durr testified at the hearing that he had known Francine since defendant was a little boy and felt close to her. He called Francine several times from prison, including May 14, 2002, May 25, 2002, May 29, 2002, and June 27, 2002. He knew that he was going to be a witness at defendant's trial in June 2002 and spoke with Francine and defendant's family about "what he was going to do." He denied that Francine suggested he testify falsely, told him specific words to repeat at defendant's trial, offered him anything in return for testimony or influenced his testimony at defendant's trial. He denied Francine told him to "just plead the Fifth" or "plead the Fifth, if push come to shove and somebody try to make you do it, all you know is [defendant] wasn't there." He said he "already had that in my mind what I was going to do."

The State entered into evidence the "guess who?" letter addressed to Durr and dated June 28, 2002. It is included in the record on appeal and reads in part:

"C-Dub, what's up lil brother! Nothing much with me. You know I started trial on the 24th. Man Dog I was nervous as hell. Yogi [the victim] came and got down on me. But her testimony wasn't as strong as I thought it was going to be. My lawyer said if she shows any doubt on the stand we are going to win. He said she showed doubt when the police first took us to her house and the 911 call. Because she said she knew who I was all the time right if that was the case why didn't she tell the police it was me from the start and she had several opportunities too. Then the part about the rape. In her original statement she said

I had on a condom. On the stand she wasn't sure if I had one on or not. And you know my D.N.A. test was negative. You should of heard the police on the stand. Do you remember the black lady and man that arrested us and took us to yogi house? They wasn't at court! It was 2 white dudes. They kept [messing] up! Dog they were [messing] up so bad one time my lawyer asked them a question about where they took us to. One officer said they took us to yogi house first. The other said they took us straight to the police station. The [expletive deleted] was crazy. That hype bitch came to court too. But she wasn't on [anything]!! I think the [S]tate really need[s] you to get down on me to get a conviction. Because they are going to use you on the 16th of July. I spoke with my lawyer about the issue[.] [H]e said the best thing for you to do is to plead the [fifth]. He said you could tell your mother to call the [public defender] and get him to file a motion for you to plead the [fifth] so you don't have to come back here. But I think that [the public defender] is on their side. You can just plead the [fifth] when you get here. He said the [S]tate is [going to] try to scare the [expletive deleted] out of you but there[']s nothing they can do. NOTHING!!! Plus[,] I heard this from the judge[']s mouth. He said if a person does not want to testify[,] he or she [does not] have to. So dog, don't let them spook you. Don't get down on me man. O.K.

   \*\*\*

Well Dog I'm about to be up. Make sure you call my momma o.k. Love family

tell your old 'g' I said hello. I'm out[.] Black"

The audio recordings and transcript of the phone calls made between Francine Hampton and Durr were admitted into evidence and are also part of the record on appeal. Relevant parts of the recordings are as follows:

May 14, 2002:

"CORY DURR (CD): That's it. ([I]naudible) then they'll say (inaudible). They'll try to call me as a witness. I wrote him a couple times (inaudible).

* * *

FRANCINE HAMPTON (FH): Okay. Do you know – what you gonna – do you know what to say when they – if they call you?

* * *

CD: I don't know what they talking about, man. I ain't got nothing for them. I say, I taking the fifth.

* * *

CD: So he ain't got nothing to worry about. Tell him it's all good."

May 24, 2002:

"CD: ([I]naudible) when you talk to (inaudible) I'm sending it there cause I gotta send it there first and then (inaudible) gotta send it to him."

May 25, 2002:

"FH: Yeah. They sure trying to use your statement against [defendant] cause that's all they got. That's the only thing they got is your statement. They

9

can't find (inaudible).

* * *

FH: ([I]naudible) but I didn't know what he was talking about. I say you want to write [defendant].

CD: Right

FH: You, you need this address (inaudible).

* * *

CD: I told him – I wrote a letter and I told him I'm gonna send it to you.

FH: Yeah, that's what I been waiting for (inaudible).

* * *

FH: They must have took your letter that you sent to [defendant].

CD: Yeah, that's what I think cause they –

FH: Yeah. Did you say anything in it?

CD: No, uhn. Just told him, man, don't worry about nothing, everything will be cool. He told me – the lawyer said he was worried about me coming back and testify (inaudible) I told him, he ain't got nothing to worry about. ([I]naudible). Be cool. I asked him how he was doing.

* * *

FH: Well, I need to know what you gonna say.

CD: ([I]naudible) I'm planning on saying nothing. They can't make me talk.

FH: Huh? Can you do that?

CD: Yeah. Well, I pleaded the fifth. What can I do?

FH: I don't know, (inaudible). They can't give you no more time.

* * *

FH: I told you I think it's best that you, that you say, I tried to say it from the beginning (inaudible).

CD: Well, he wasn't there with us. Right.

FH: ([I]naudible) he wasn't there, they kept on beating me and telling me, yes, he did, yes, you did.

CD: Right

FH: So I just went on and agreed with what they said. But why did you take the time. Cause I just don't like, you know, (inaudible) going to jail anyway.

CD: Right.

FH: ([I]naudible) really wasn't fair. I don't, I don't remember (inaudible) being there (inaudible).

CD: But I told the public defend[er], I told him, told him that, that I didn't know that I – that what I was signing. I thought it was – they told me I was signing something to say that (inaudible) the question.

FH: Right, right.

CD: And once I found out what it was, it was too late to, you know what I'm saying, take it back.

FH: Uh-huh.

11

CD: So I – it took a little time to go ahead and get out. ([I]naudible[.])

FH: Right, right.

CD: That's really it. And anything else I ain't got nothing to say about that. I already took my time.

* * *

FH: They, they gonna probably make you say (inaudible) was there.

CD: They – ain't nothing happening. ([I]naudible[.])

* * *

FH: Cause see sometimes you get there and say I plead the fifth and then they're saying, I don't know. I don't know. But I know you gonna handle it.

CD: I got that. Tell him don't worry about it.

FH: All right.

* * *

CD: Man, when you talk to him tell him don't even worry about it, (inaudible).

FH: You got it.

CD: I got it.

FH: Don't let them trick you for it.

CD: No.

FH: Don't sign your name or nothing.

* * *

CD: When I go in there and tell him (inaudible) they ain't got nothing else on him. If, if, if the witness ain't there (inaudible) they ain't got no case.

FH: Right.

CD: ([I]naudible) eat them up and try and let the [S]tate figure it out. Cause they ain't got nothing. They ain't got no, no solid evidence.

\* \* \*

CD: ([I]naudible) I'm like, man, I gotta go back to the County, man. I wish I didn't have to go back, man. I asked dude why he (inaudible) they might call me back. He told me, no. And I told my lawyer, I said (inaudible). He say, it's over with (inaudible). And if they ain't got no evidence – he say, the evidence (inaudible) said they ain't go no evidence (inaudible) on [defendant]. She like, well, (inaudible). You should be coming home.

\* \* \*

CD: ([I]naudible[.]) I told him, I told him in my letter when I, when I get out we (inaudible) by the time I get out. And we going down when we get out.

\* \* \*

CD: I'm gonna be cool. Tell him don't worry about it, man. ([I]naudible[.])

FH: Yeah, he worried about it.

CD: Tell him don't worry, man.

\* \* \*

FH: They gonna be kind of questions, I didn't know what I was saying. And I told him – (inaudible) was not there. That's all you need to say.

CD: Right.

FH: He wasn't there, you know.

CD: And then they gonna ask me, why (inaudible). I didn't know exactly what I was signing. The police told me I was signing something different. (Inaudible) and they gave me that paper.

FH: Yeah.

* * *

FH: Every time they ask you a question just take a deep breath before you answer. ([I]naudible[.]) And remember we gonna be there in court."

May 29, 2002:

"FH: If they ask you your name plead the fifth.

CD: Huh?

FH: If they ask you your name plead the fifth.

* * *

CD: I want to know where – what, what they was gonna be trying to ask me.

FH: Oh, okay. I'm gonna – you know what, I'm, I'm gonna call him the day before court.

CD: Right.

14

FH: On the 9th.

CD: Okay.

FH: I'll call him on the 9th. But I think you're thing is to plead the fifth when they get you on the stand. They said they probably won't even bring you in the court room.

* * *

FH: You'll plead the fifth. They probably gonna try to scare you.

* * *

FH: ([I]naudible) scare you and say they gonna hold you in contempt. Just tell them I plead the fifth. Don't answer no questions. Don't even tell them your name.

CD: Right.

FH: What's your name. I plead the fifth.

CD: Ok. I was gonna ask you what do you say. I was gonna ask you to ask them what he wanted me to say.

FH: Just plead the fifth.

CD: All right, okay.

FH: Say from day one, plead the fifth.

***

FH: ([I]naudible) call me on the 9th. I say I know you gonna call me. Did (inaudible)?

CD: Right.

\* \* \*

FH: If they don't let you call, just plead the fifth.

CD: All right. That's all I wanted to know.

FH: Plead the fifth. If push come to shove and somebody try to make you, all I know is [defendant] wasn't there.

CD: Right.

FH: ([I]naudible) you know what you said (inaudible).

CD: Right, right, right, exactly, okay.

FH: ([I]naudible) get out. But was [defendant] there, no, he wasn't there.

CD: Okay. All that's [*sic*] I needed to know.

\* \* \*

CD: Tell him, I say, man, just be cool. I got him though.

\* \* \*

FH: Yeah. ([I]naudible) if the people down there told (inaudible) get to talk to you and tell you when you get on the witness stand raise your right hand, I plead the fifth. I don't have nothing to say. If push to come shove and they might push you and try to scare you (inaudible) contempt carry 30 days.

CD: Man, I'm already doing time, man. It ain't nothing.

\* \* \*

FH: ([I]naudible) they made me (inaudible).

16

CD: Right.

FH: I remember, I remember and my mind came back and [defendant] wasn't there.

CD: Okay. Tell him don't worry, I got him.

FH: You got him?

CD: Yeah.

FH: Don't get scared, Corey.

***

FH: Ain't nothing they can do to you.

* * *

CD: So I ain't worried about it. Tell, tell him just be cool. And he'll be out and then the following summer I'll be back out.

* * *

CD: All right, I'll talk with you. All right, I'll talk to you later.

FH: Okay, love you, Corey.

CD: I love you too, Miss Hampton.

FH: Okay, call me on the 9th if you can (inaudible).

CD: All right."

June 27, 2002

"FH: ([I]naudible[.]) They gonna bring you back.

CD: Yeah.

FH: Yeah. ([I]naudible[.])

CD: When they talking about bringing me back?

FH: July 16th.

CD: ([I]naudible[.]) Cause –

FH: Huh?

CD: Cause my momma say he talked to – the lawyer said that he (inaudible) my, my rights. He say I ain't gotta take it if I don't want to.

FH: Yeah, (inaudible).

CD: Cause that's when I told her, I told her, I ain't (inaudible) talk to the lawyer and call back. When I talk to her she said (inaudible) I won't have to testify. That's what dude said.

\* \* \*

CD: She talked to the one that (inaudible) public defender. The one who run the show.

FH: Uh-huh.

CD: He said I wouldn't have to testify if I didn't want to.

FH: Huh?

CD: He said I wouldn't have to testify if I didn't want to.

FH: ([I]naudible) the public defender be there with you.

CD: Right.

FH: ([I]naudible) said they gonna try to scare you to the point that, you

know, you just gonna –

CD: I ain't going – cause that's what they did right there the first time. He's talking about he can charge me with perjury (inaudible) extra time. I said, yeah, okay, then, so be it then.

FH: Uh-huh.

CD: He got mad.

FH: Yeah, (inaudible) there's nothing they can do to you. He said anything – the only thing they can do to you is charge you (inaudible). And that's (inaudible) 30 days and you have to do 14 days.

\* \* \*

FH: If they charge you with perjury, give you 30 days.

CD: Right.

FH: He said but they ain't coming to you like that. They came into you (inaudible) major time.

CD: Right, I understand.

FH: ([I]naudible) public defender have the paperwork done and where you at.

CD: Right.

FH: Send you the paperwork and you sign it saying you plead the fifth.

CD: Right.

FH: And he can just present to the judge like that. They don't have to

bring you all (inaudible).

\* \* \*

CD: They was talking a whole bunch of lies. You talk to [defendant]?

FH: Yeah.

\* \* \*

FH: He still real scared cause she got up (inaudible).

\* \* \*

FH: You know what [the victim] said?

CD: What?

FH: [The victim] said (inaudible).

\* \* \*

CD: How many people did she say that was in the house that day?

FH: ([I]naudible) three.

CD: Okay. There was three, right. ([I]naudible) me and him (inaudible). Where the other person at?

\* \* \*

FH: They said she said (inaudible). She said that (inaudible).

\*\*\*

FH: One was in the front, one was in the back.

\* \* \*

FH: Then they changed places, one got in the front and one got in the back.

20

\*\*\*

FH: And then she say, well, [defendant] trying to get in the front (inaudible) and she said no. And he said well the DNA came back negative.

\*\*\*

FH: And she said well, he didn't ejaculate. He said well they found semen on the (inaudible).

\* \* \*

FH: ([I]naudible) to call 911. She said (inaudible).

\* \* \*

FH: You can't talk like you from the (inaudible). They gonna look at your face (inaudible).

\* \* \*

FH: ([I]naudible) ask for a lawyer will I have to come back and testify when the [S]tate call me (inaudible). They told me no. So I – that's why I went and took the time. If I would have knew they was gonna call me back (inaudible).

\* \* \*

FH: Okay. And if you don't send them and they bring you back on the 16th, you know what to do.

CD: Yeah, I plead the fifth. I ain't got nothing to say. I told that – I told [defendant] that in the – when they brought me back the first time.

FH: ([I]naudible) That's all they got.

21

CD: All right. Well, I'm fitting to get off this phone. Tell [defendant],

man, he gonna be all right so."

After the trial court reviewed the audiotapes and transcript of the conversations between Francine and Durr, the State rested. A motion for a directed verdict was denied. The defense then called Durr to testify.

Durr testified that he had known the Hampton family all this life and acknowledged speaking with Francine on the phone while he was in prison. He said that it was his decision alone to plead the fifth at defendant's trial and denied that Francine or defendant encouraged him to take the fifth. Durr admitted to speaking with Francine regularly but could not remember the exact dates. He denied discussing defendant's trial with Francine. He acknowledged that when he pled guilty to his crime, he had given his handwritten statement freely and that it was true and accurate.

Having listened to the audiotapes, the court added the following to the record: (1) on the May 14, 2002, tape Durr admitted to his voice, and the caller identified herself as "Black's mom"; (2) on May 25, 2002, the same voice the court recognized as being Black's (defendant's) mom or Francine Hampton said, "I need to know what you going to say. Don't let them trick you for it"; (3) on the May 29, 2002, transcript, the same voice the court attributed to Francine said she had talked to defendant, he was nervous and that if Durr was asked his name, to plead the fifth; (4) on July 4, 2002, the voice of Francine said that "Junior [defendant] has been asking if she and Mr. Durr have been talking, and it indicates that there was conversation going on"; and (5) on June 27, 2002, Francine indicated to Durr "you know what to do."

The court discussed the letter defendant sent to Durr and found that, while Durr did not receive the letter, it evidenced defendant's intent to procure Durr's absence by wrongful means.

The trial court found that defendant, via his mother Francine Hampton, procured Cory Durr's unavailability and so forfeited his confrontation rights. The court reinstated defendant's convictions and the 84-year sentence in accordance with our decision in Hampton, 363 Ill. App. 3d at 301.

On appeal, defendant first contends that the State failed to establish he forfeited his right to confront Cory Durr based on phone calls between Durr and defendant's mother where no evidence rebutted Durr's testimony that: (1) he decided to take the fifth before speaking to defendant's mother; (2) Durr initiated the calls; (3) defendant did not know of the calls; and (4) his mother's discussions with Durr did not constitute wrongdoing.

The sixth amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend VI. In Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Court held that testimonial hearsay is inadmissible unless (1) the declarant is unavailable and (2) the accused had an earlier opportunity to cross-examine the declarant. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The Crawford Court expressly adopted "the rule of forfeiture by wrongdoing" that "extinguishes confrontation claims on essentially equitable grounds." Crawford, 541 U.S. at 62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370, citing Reynolds v. United States, 98 U.S. 145, 158-59, 25 L. Ed. 244, 247-48 (1878).

In People v. Stechly, 225 Ill. 2d 246, 870 N.E.2d 333 (2007), the Illinois Supreme Court

23

adopted the forfeiture-by-wrongdoing doctrine in holding that " 'one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.' " Stechly, 225 Ill. 2d at 269, quoting Davis v. Washington, 547 U.S. 813, 833, 165 L. Ed. 2d 224, 244, 126 S. Ct. 2266, 2280 (2006).

To invoke the doctrine of forfeiture-by-wrongdoing, the State must prove by a preponderance of the evidence at a hearing in the trial court "that the defendant intended by his actions to procure the witness' absence." Stechly, 225 Ill. 2d at 277-78, citing Davis, 547 U.S. at 833, 126 L. Ed. at 244, 126 S. Ct. at 2280; see also In re Rolandis G., 232 Ill. 2d 13, 42, 902 N.E.2d 600 (2008) ("[t]he doctrine of forfeiture by wrongdoing may not be employed to deny an accused his confrontation right absent evidence that, when committing the crime or other wrongdoing, the accused was motivated by the desire to prevent the witness from testifying against him at trial").

We will defer to the trial court's finding that a defendant forfeited his right to confrontation " ' " 'unless the trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " ' " People v. Spicer, 379 Ill. App. 3d 441, 451, 884 N.E.2d 675 (2007), quoting People v. Purcell, 364 Ill. App. 3d 283, 293, 846 N.E.2d 203 (2006), quoting People v. Caffey, 205 Ill. 2d 52, 89, 792 N.E.2d 1163 (2001), quoting People v. Williams, 188 Ill. 2d 365, 369, 721 N.E.2d 539 (1999).

In Hampton, after analyzing Reynolds, 98 U.S. at 158-59, 25 L. Ed. at 247-48, we concluded that "any conduct by an accused intended to render a witness against him unavailable to testify is wrongful and may result in forfeiture of the accused's privilege to be confronted by

that witness." <u>Hampton</u>, 363 Ill. App. 3d at 301; see also Fed. R. Evid. 804(b)(6) (forfeiture by wrongdoing applies when a defendant "has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness"); <u>U.S. v. Rivera</u>, 412 F.3d 562, 567 (4th Cir. 2005) ("[a]ctive participation or engagement, or *** the personal commission of the crime, is not required").

Here, we believe the State established by a preponderance of the evidence that defendant engaged in conduct intended to render Durr unavailable to testify against him at trial. First, the "guess who?" letter was properly considered as evidence of defendant's intent to wrongfully procure Durr's absence at trial. It is undisputed that defendant was the author of the letter and Durr was the intended recipient. The letter was mailed on June 28, 2002, four days after defendant's trial began. Defendant discusses trial evidence in the letter and tells Durr he will be called to court to testify on July 16, 2002. Defendant repeatedly tells Durr to "plead the fifth" because the "[S]tate really need[s] you to get down on me to get a conviction." Defendant instructs Durr to "tell your mother to call the [public defender] and get him to file a motion for you to plead the [fifth] so you don't have to come back here." Defendant ends the letter by telling Durr not to "get down on me man" and to "[m]ake sure you call my momma o.k." As noted by the trial court, although Durr never received the letter, it is evidence of defendant's intent to influence Durr not to testify at defendant's trial. <u>Hampton</u>, 363 Ill. App. 3d at 301.

Second, the trial court's finding that "there was a common plan or scheme between the defendant and his mother to procure the unavailability of Mr. Durr invoking the Fifth Amendment" is supported by the record. On multiple occasions Francine specifically instructed

25

Durr to "plead the Fifth" and coached him on how to lie under oath during defendant's trial. The trial court found Durr to be an incredible witness, discrediting defendant's assertion that Durr had already made up his mind to plead the fifth. To the contrary, the phone conversations evidence a concerted effort on Francine's part to make sure Durr did not testify. The record also supports the trial court's finding that Durr and defendant were communicating:

"CD: That's it. ([I]naudible) then they'll say (inaudible). They'll try to call me as a witness. I wrote him a couple times (inaudible).

\* \* \*

CD: ([I]naudible) when you talk to (inaudible) I'm sending it there cause I gotta send it there first and then (inaudible) gotta send it to him.

\* \* \*

FH: Yeah. They sure trying to use your statement against [defendant] cause that's all they got. That's the only thing they got is your statement. They can't find (inaudible).

\* \* \*

FH: ([I]naudible) but I didn't know what he was talking about. I say you want to write [defendant].

CD: Right

FH: You, you need this address (inaudible).

\* \* \*

CD: I told him – I wrote a letter and I told him I'm gonna send it to you.

26

FH: Yeah, that's what I been waiting for (inaudible).

* * *

FH: They must have took your letter that you sent to [defendant].

CD: Yeah, that's what I think cause they –

FH: Yeah.  Did you say anything in it?

CD: No, uhn.  Just told him, man, don't worry about nothing, everything will be cool.  He told me – the lawyer said he was worried about me coming back and testify ***.  ***

* * *

CD: ([I]naudible[.])  I told him, I told him in my letter when I, when I get out we (inaudible) by the time I get out.  And we going down when we get out.

* * *

CD: I'm gonna be cool.  Tell him don't worry about it, man.  ([I]naudible[.])

* * *

CD: Ok.  I was gonna ask you what do you say.  I was gonna ask you to ask them what he wanted me to say."

The record supports the trial court's finding that defendant and his mother engaged in a concerted effort to influence Durr not to testify.  We reject defendant's contention that the State was required to show defendant actually caused Durr's unavailability.  See Commonwealth v. Edwards, 444 Mass. 526, 541, 830 N.E.2d 158, 171 (2005) ("in collusion cases *** a defendant's

joint effort with a witness to secure the latter's unavailability, regardless of whether the witness already decided 'on his own' not to testify, may be sufficient to support a finding of forfeiture by wrongdoing"). The State proved what it needed to: that defendant engaged in conduct intended to render Durr unavailable to testify at defendant's trial. See, *e.g.*, Hampton, 363 Ill. App. 3d at 301 ("any conduct by an accused intended to render a witness against him unavailable to testify is wrongful and may result in forfeiture of the accused's privilege to be confronted by that witness"); Edwards, 444 Mass. at 540-41, 830 N.E.2d at 171 ("[a] finding that a defendant somehow influenced a witness's decision not to testify is not required to trigger the application of the forfeiture by wrongdoing doctrine where there is collusion in implementing that decision or planning for its implementation); State v. Hallum, 606 N.W.2d 351, 356 (Iowa 2000) ("it is the fact that a defendant's conduct interferes with the interest in having witnesses testify at a public trial that makes the defendant's conduct wrongful").

We cannot say that the trial court's exercise of discretion has been frustrated by an erroneous rule of law. Spicer, 379 Ill. App. 3d at 451. Because the State established by a preponderance of the evidence that defendant engaged in conduct intended to render Durr unavailable to testify against him at trial, defendant forfeited his right to claim a confrontation clause violation under the forfeiture-by-wrongdoing doctrine.

Defendant next contends, and the State agrees, that this cause must be remanded for resentencing under People v. Hauschild, 226 Ill. 2d 63, 871 N.E.2d 1 (2007). In Hauschild, our supreme court found that the defendant's sentence for armed robbery while armed with a firearm (720 ILCS 5/18-1(a), 18-2(a)(2) (West 2000)) violated the proportionate penalties clause because

28

the penalty for that offense was more severe than the penalty for the identical offense of armed violence predicated on robbery while carrying a firearm (720 ILCS 5/33A-1(c)(1) (West 2000)). Hauschild, 226 Ill. 2d at 86-87.

Here, defendant received a 15-year add-on to each of his four sentences for aggravated criminal sexual assault with a firearm (720 ILCS 5/12-14(a)(1) (West 2000)). These add-ons make the sentences disproportionate to the penalty for armed violence predicated on criminal sexual assault (720 ILCS 5/33A-2 (West 2000)), which contains identical elements. Under Hauschild, 226 Ill. 2d at 86-87, the 15-year add-on for aggravated criminal sexual assault with a firearm is unconstitutional. We reverse defendant's four sentences for aggravated criminal sexual assault with a firearm and remand for resentencing.

Finally, defendant contends, and the State agrees, that we should vacate one of his convictions for home invasion where there was only one physical act of illegal entry and vacate four of his convictions for aggravated criminal sexual assault where each count was "based on the same four acts of penetration." Multiple convictions cannot stand where a single physical act is the basis for both charged. People v. King, 66 Ill. 2d 551, 565-66, 363 N.E.2d 838 (1977). Here, the record shows that defendant made only one illegal entry into the victim's home. Defendant may only be convicted of one count of home invasion. People v. Hicks, 181 Ill. 2d 541, 548-49, 693 N.E.2d 373 (1998); People v. Cole, 172 Ill. 2d 85, 101-02, 665 N.E.2d 1275 (1996). The record also shows that defendant's eight convictions for aggravated criminal sexual assault (720 ILCS 5/12-14(a)(4), (a)(8) (West 2002)) were based on the same four acts of sexual assault. Because there were only four acts, four of defendant's eight convictions for aggravated criminal

sexual assault with a firearm must be vacated. People v. Coleman, 212 Ill. App. 3d 997, 1005, 571 N.E.2d 1035 (1991).

In conclusion, we find defendant forfeited his right to claim a confrontation clause violation under the forfeiture-by-wrongdoing doctrine. We reverse defendant's four sentences for aggravated criminal sexual assault with a firearm and remand for resentencing. We order the mittimus corrected to reflect a single conviction for home invasion and four convictions for aggravated criminal sexual assault according to Illinois Supreme Court Rule 615(b)(1). 134 Ill. 2d R. 615(b)(1); People v. McCray, 273 Ill. App. 3d 396, 403, 653 N.E.2d 25 (1995).

Affirmed in part, reversed in part and remanded with instructions; mittimus corrected.

GARCIA, P.J., and McBRIDE, J., concur.