2015 IL App (4th) 130644

NOS. 4-13-0644, 4-13-0650 cons.

FILED
September 18, 2015
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| EDDIE BROTHERS, | ) | Nos. 12CF891, |
| Defendant-Appellant. | ) | 12CF1020 |
| | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Knecht and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    In January 2013, a jury in McLean County case No. 12-CF-891 convicted

defendant, Eddie Brothers, of home invasion (720 ILCS 5/12-11(a)(1) (West 2010)), three counts

of aggravated criminal sexual assault (two involving vaginal penetration and one involving anal

penetration) (720 ILCS 5/11-1.30(a)(1) (West 2010)), three counts of domestic battery (720

ILCS 5/12-3.2(a)(1) (West 2010)), and aggravated unlawful restraint (720 ILCS 5/10-3.1(a)

(West 2010)).  That same month, defendant pleaded guilty to harassment by telephone (720

ILCS 135/1-1 (West 2010)) and violation of a bail bond (720 ILCS 5/32-10(b) (West 2010)) in

McLean County case No. 12-CF-1020.

¶ 2    Defendant's convictions in case No. 12-CF-891 stemmed from a September 2012

incident in which defendant entered the trailer of his estranged lover, A.W., and physically and sexually attacked her over the course of several hours. Defendant's convictions for harassment by telephone and violation of a bail bond in case No. 12-CF-1020 resulted from numerous jailhouse phone calls defendant made to A.W. while he was in pretrial custody in case No. 12-CF-891. In those calls, defendant persuaded A.W. not to cooperate with the prosecution in case No. 12-CF-891. In March 2013, the trial court sentenced defendant to aggregate prison terms of 95 years in case No. 12-CF-891 and 6 years in case No. 12-CF-1020, with the 6-year sentences to be served consecutively to those imposed in case No. 12-CF-891.

¶ 3　　　　Defendant appeals, arguing that he was denied a fair trial in case No. 12-CF-891 because (1) the trial court improperly admitted, as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2012)), A.W.'s hearsay statements to a detective; (2) the State presented improper opinion testimony from police officers regarding defendant's and A.W.'s credibility; and (3) the State failed to present sufficient evidence to sustain defendant's conviction for home invasion.

¶ 4　　　　We agree with defendant that the State presented inadmissible hearsay and opinion testimony. Because the only evidence supporting one of defendant's convictions for aggravated criminal sexual assault (involving anal penetration) was inadmissible hearsay, we reverse that conviction and remand for further proceedings on that count. However, because (1) the properly admitted evidence overwhelmingly proved defendant guilty of the remaining counts and (2) no reasonable probability exists that the jury would have acquitted defendant if the improper hearsay and opinion testimony had been excluded, we affirm defendant's remaining convictions.

¶ 5                                    I. BACKGROUND

¶ 6          The State presented the following evidence at defendant's January 2013 jury trial.

¶ 7                                  A. A.W.'s Testimony

¶ 8          A.W. testified that on September 4, 2012, she ended her romantic relationship with defendant. In light of the break up, she changed the locks on her trailer home, which was located in the Royal Acres mobile home park (Royal Acres) in Normal, Illinois.

¶ 9          On September 6, 2012, A.W. went to work at 2:45 p.m., locking the door of her trailer behind her. When she returned home shortly after 10:30 p.m., she unlocked her front door and went inside to the bathroom, where she removed her clothes. As A.W. was using the bathroom, defendant emerged from inside the shower stall. A.W. tried to get away from defendant through the back door of the trailer, but defendant grabbed her and brought her into the kitchen. Defendant was angry because he suspected that A.W. was "messing around" with his brother, Gregory. Defendant took A.W.'s cell phone from the counter and began looking through it.

¶ 10         A.W. testified that after defendant took her phone, the next thing she remembered was running through the street to her grandfather's house wearing only a towel. When the State asked A.W. why she was wearing only a towel, she recalled that she had taken a shower in her trailer, but she claimed that she did not remember anything else that happened in the trailer.

¶ 11         The trial court admitted an audio recording of a 9-1-1 call made immediately after the incident. (We note that A.W.'s mother—who did not testify—initiated the 9-1-1 call and spent the first several minutes of the call giving her secondhand account of the incident to the dispatcher. Pursuant to the parties' agreement, the jury heard only the portion of the call after

- 3 -

A.W. began speaking.) A.W. sounded hysterical and was sobbing throughout much of the 9-1-1 call. Because both defendant and the State agree that the 9-1-1 call was a critical piece of evidence, we set forth the pertinent portions of the call in detail, as follows:

"[DISPATCHER]: Take a deep breath for me, okay? Alright, now what's your name?

[A.W.]: [A.W.]

[DISPATCHER]: Okay, so you explain to me exactly what happened over at your trailer.

[A.W.]: I got home from work [probably] like 10:45, and I went into the bathroom to get ready to get in the shower like I always do, and he was hiding in the shower.

[DISPATCHER]: Okay, and what happened then?

[A.W.]: He got out and he kept talking about—'cause he said I'm messin' with his brother. So he kept—that's all he kept saying. He grabbed me by my hair and dragged me in the kitchen where my phone was so he could go through it. Then he got the knives out of the drawer and he followed me around everywhere I went so I couldn't leave, and he made me take all my clothes off and walk around. He made me—he made me have sex with him twice. And he had me in there for a couple hours. Finally I convinced him I needed to go out to the car to get my—

[DISPATCHER]: —Okay. Okay. Did he actually cut you

- 4 -

at all?

[A.W.]: No. He punched me in my back and then punched me in my chest. Then when I finally convinced him I needed to get my insulin out of the car, I was in a towel, and while he was bent over in the car looking, I ran down the street to my grandpa's house, and he came chasing after me and ripped my towel off, so I just started screaming. And then he finally ran off. And then my grandpa—

[DISPATCHER]: Okay.

[A.W.]: —I came to his porch.

[DISPTACHER]: *** So, okay, backup here. *** Do you know where he's at now?

[A.W.]: I don't know.

[DISPATCHER]: Okay, can you describe what he's wearing for me?

[A.W.]: Um, I think it was a black T-shirt and some blue jeans.

[DISPATCHER]: Did he have keys to your trailer?

[A.W.]: He had all my—he has all my keys, to the car and everything.

[DISPATCHER]: Okay, do you need an ambulance to check you out at all? [*pause*] Okay, A.W.?

[A.W.]: I—I don't. He just had me on the ground once I—he caught me coming from his brother's house 'cause he was hiding me in his shower.

[DISPATCHER]: Okay, A.W., you need to talk to me instead of whoever is there, okay? Are you talking to an officer now?

[A.W.]: I am talking to you.

[DISPATCHER]: Okay. *** When you took off running, do you know if he went back in the home? Did he go off on foot somewhere?

[A.W.]: Well, he had to have went back to the house 'cause all he had was a towel on. So he had to go back to the house to put his clothes on.

[DISPATCHER]: Okay. Did, at any times when he had you take your clothes off and his clothes were off, did he try and have—have intercourse with you at all?

[A.W.]: He—he made me twice.

* * *

[DISPATCHER]: Okay, so—so you both had towels on when you went out to the car?

[A.W.]: Yes.

[DISPATCHER]: Okay.

- 6 -

[A.W.]: 'Cause he made me get in the shower because I'm on my period and he made me have sex with him, so it was messy. So he made me get in the shower. [*Long pause.*] What, are they outside?

[DISPATCHER]: Okay, is there an officer out there now?

[A.W.]: I can hear 'em.

[DISPATCHER]: Okay, if there's an officer out there now, you need to talk to them, okay?

[A.W.]: Okay.

[DISPATCHER]: Alright. [End of call.]"

¶ 12    A.W. testified that shortly after the incident, she began receiving several phone calls each day from defendant, who at that time was in custody at the McLean County jail. A.W. claimed to remember nothing about the calls, other than defendant's saying he loved her, and her telling defendant she loved him, too. A.W. admitted that she subsequently disobeyed a grand jury subpoena and refused to testify against defendant at grand jury proceedings. (The trial court took precautions to prevent the jury from learning that A.W. was testifying at defendant's trial while she was in custody, after having been arrested pursuant to a bench warrant for her refusal to comply with the State's trial subpoena.)

¶ 13    A.W. professed to having no memory of her conversations with the 9-1-1 dispatcher or police officers after the incident. She denied refusing to provide the police with a recorded statement about the incident. She explained that the officers never came to her for a recorded statement, as they originally told her they would. The following exchange occurred on

direct examination by the State:

"[THE STATE]: [Y]ou talked to an officer on September 7th, [2012,] is that correct?

[A.W.]: Yes, I believe I talked to several of them.

[THE STATE]: Okay. You actually even walked an officer through your house. Is that right?

[A.W.]: I might have. I don't remember that neither.

[THE STATE]: And when you talked to that officer and walked them through, you even pointed out certain evidence about things that happened that night. Is that right?

[A.W.]: I—I guess so. I don't recall it[.]"

* * *

[THE STATE]: Now, when you talked to the officer, you gave him details about what happened between you and the defendant that night, correct?

[A.W.]: If I would have did it that night, then I probably would have remembered that night if I did give him details. I just don't remember what happened now.

[THE STATE]: Did you tell him that night what happened?

[A.W.]: I guess so. I can't say for sure because I don't remember."

Although A.W. professed memory loss as to the content of her prior conversations, she stated that she would not have lied or "made something up" to police officers or the 9-1-1 dispatcher. She also stated that she would not have had sex willingly while on her period.

¶ 14        On cross-examination, A.W. testified that she had spoken with defendant several times each day between the September 4, 2012, break up and the September 6, 2012, incident. She and defendant were both uncertain as to whether they should actually end their relationship. The following exchange occurred between defense counsel and A.W.:

"[DEFENSE COUNSEL]:  Didn't you agree to talk with [defendant] about your relationship after you got off work, and didn't you leave the door unlocked for him to come in and wait for you?

[A.W.]:  I'm not sure about leaving the door unlocked.  But I do, I remember saying I'd talk to him but I didn't say an exact time and place I was going to talk to him.

* * *

[DEFENSE COUNSEL]:  Is it possible that you did leave the door unlocked?

[A.W.]:  Anything is possible.

[DEFENSE COUNSEL]:  Didn't you—didn't you acknowledge in a written affidavit that you may have left the door unlocked after a conversation with him?

[A.W.]:  I may have, but with me having to use my key, I

- 9 -

just figured nobody was there.  I mean maybe he could have went in and locked it back.  But like I say, I don't remember."

¶ 15        Later on cross-examination, defense counsel asked A.W. about an affidavit she completed after the State charged defendant in this case:

"[DEFENSE COUNSEL]:  And in this written affidavit that you faxed to the State's Attorney, you remember that, don't you, that document?

[A.W.]:  I don't remember what all I said in it, sir.

[DEFENSE COUNSEL]:  You don't remember writing [']the night in question we were arguing and things got out of proportion, and, yes, I was mad, but I laid there because of my love for him and I never told him no.[']  You don't remember writing that?

[A.W.]:  I remember writing it, but if I—if I would have laid there, it would have had to have been—I wouldn't have.  If I was scared, I would have did it.  I would have laid there.  But like I said, I don't remember how I [was] even feeling at that point because I don't remember being in the room with him."

¶ 16                            B.  Sergeant Longfellow's Testimony

¶ 17        Sergeant Jeff Longfellow, an investigator with the Normal police department, testified that on September 7, 2012, he spoke with A.W. at Royal Acres.  The State's direct examination of Longfellow proceeded, as follows:

"[THE STATE]:  Were you able to understand what she was saying?

[LONGFELLOW]:  She briefly told me what happened. She basically stated that—

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Just a minute.  Counsel?

[DEFENSE COUNSEL]:  We object.

THE COURT:  [Counsel for the State?]

[THE STATE]:  Basically just [answer] the question, could you understand the words that she was saying?

[LONGFELLOW]:  I could understand, yes, I could.

THE COURT:  Objection is sustained.  Ask your next question.

[THE STATE]:  Did you ask her what happened?

[LONGFELLOW]:  I did.

[THE STATE]:  And was she able to tell you what happened?

[LONGFELLOW]:  She did.

[THE STATE]:  And did she give you great detail or not?

[LONGFELLOW]:  Very great detail.  We went over the entire incident twice.

* * *

- 11 -

[THE STATE]:  And what did she tell you happened?

[LONGFELLOW]:  When—

[DEFENSE COUNSEL]:  Object, hearsay.

THE COURT:  Counsel?

[THE STATE]:  You Honor, at this point in time, we'd like to use this, because the victim has made a prior inconsistent statement and this is to be used as impeachment and substantive evidence.

THE COURT:  [Defense counsel], anything else?

[DEFENSE COUNSEL]:  Judge, I think she testified she didn't remember the substance of any statement that she made.  I don't recall whether she was confronted with the details of the statement, alleged statement.

[(At this point, the trial court excused the jurors from the courtroom and directed Longfellow to wait in the hallway.)]

THE COURT:  All right, counsel for the State, I need you to tell me specifically[,] under what section are you offering this[?]

[THE STATE]:  You Honor, [section 115-10.1 of the Code] 725 ILCS 5/115-10.1.

THE COURT:  [Section 115-]10.1 [of the Code], all right, thank you.

All right, [defense counsel], your objection is?  Here is just

- 12 -

a straight hearsay objection, is that correct?

[DEFENSE COUNSEL]: Yes, it is a hearsay objection. I think that the witness testified that she didn't have a specific recollection, but I don't believe she was questioned about a detailed interview that she gave with Sergeant Jeffrey Longfellow, and she wasn't given an opportunity[,] or I don't believe that *** her lack of memory is necessarily inconsistent, having not been confronted with these alleged statements. So that's the substance of my objection.

THE COURT: Counsel, anything else?

[THE STATE]: Your Honor, she testified under oath that she believed that she had talked to the officers, that she does not remember what she told the officers. And she did say that what she told the officers would have been truthful, basically saying that she would not have lied to the officers.

THE COURT: All right. And just so I understand, and perhaps you were going to ask some more questions, but given the discovery you have and what you expect this witness to testify to, is this an oral statement simply?

[THE STATE]: It is, Your Honor.

THE COURT: So this is not a recorded statement?

[THE STATE]: Correct.

THE COURT: All right. [Defense counsel], anything else?

[DEFENSE COUNSEL]: No thank you, Judge.

THE COURT: All right, the concern that the court has, I will tell you that I'm going to overrule the objection. I'm going to allow the officer to testify under [section] 115-10.1 [of the Code]. I think the weak point here is [section 115-10.1 of the Code] does require that the witness who made the out of court statement acknowledge the making of the statement, since it's not written and signed by the witnesses and since it was not recorded. The witness did acknowledge, that being [A.W.], that she spoke with officers. She could not recall which ones, but she indicated she did speak with someone. She just couldn't remember who it was. In the court's view, that's somewhat sketchy, but it is an acknowledgement under oath that she made statements.

This witness had now testified, at least preliminarily, that he spoke with her and that she gave him statements that were based on her personal knowledge, events that she had personal knowledge of[,] and gave some great detail on it. So, the court finds that it is admissible under [section 115-10.1 of the Code], and I will allow the witness to testify as to the content of the statement over objection."

- 14 -

Following the trial court's ruling, the State elicited the following testimony from Longfellow.

¶ 18        Longfellow testified that after he spoke with A.W. inside her grandparents' trailer at Royal Acres, he walked with A.W. to her trailer, which was approximately 100 yards away. There, in the early morning hours of September 7, 2012, A.W. walked Longfellow through her trailer to explain the sequence of events and identify potential evidence. When the State asked Longfellow what A.W.'s demeanor was like as she was explaining what happened, Longfellow gave the following response:

> "She was still in shock. I mean it was just a very blank
> stare. She was scared, you know, talking about it, still trembling
> but very believable, very credible."

¶ 19        A.W. told Longfellow that after she arrived home shortly after 10:45 p.m. on September 6, 2012, defendant emerged from behind her shower curtain while she was urinating. Defendant was gritting his teeth and appeared angry. Defendant told A.W. that he had seen her texting someone in her car before she came inside. A.W. became scared and attempted to flee from the trailer through the back door. Defendant grabbed A.W. by her hair and throat and brought her into the kitchen. Defendant then took A.W.'s cell phone and began looking through the text messages. Defendant told A.W. that he was going to use her phone to text his brother, Gregory, while posing as A.W., to determine whether A.W. and Gregory were having an affair. After defendant accused A.W. of having relations with Gregory, he punched her in the right side of her lower back, causing a bruise.

¶ 20        A.W. told Longfellow that defendant pushed her onto the kitchen floor and grabbed a knife, which he "held in a threatening manner" and "used it to sort of control her as

they moved around the trailer." (Although Longfellow found two kitchen knives in A.W.'s trailer, A.W. did not recall which of the knives defendant used.) Next, defendant gestured with the knife for A.W. to enter the bedroom. Once in the bedroom, defendant told A.W. to take off her clothes and get on the bed. As Longfellow explained, defendant then "placed the knife to the side, and he had vaginal intercourse with [A.W.] against her will." A.W. was crying, and she told defendant to stop several times. She did not fight back because she thought he would attack her with the knife.

¶ 21    A.W. told Longfellow that after defendant had intercourse with her, he made her take a shower because she was menstruating. Defendant told A.W. that he would hurt her if she tried to run away. Before going into the shower, A.W. saw defendant use a towel to wipe menstrual blood from his genitals. A.W. showed Longfellow that towel, which was laying in her living room. A.W. also showed Longfellow defendant's underwear, which was laying on the bedroom floor, stained with menstrual blood.

¶ 22    Once A.W. got out of the shower, defendant used A.W.'s cell phone to record nude video images of her. Defendant told A.W. that he was going to post the videos on Facebook. Defendant was drinking gin at the time. He continued to send text messages to Gregory from A.W.'s phone. In a text message to A.W.'s cell phone, Gregory asked for the return of his digital video disc (DVD) player, which A.W. had in her trailer. Defendant, apparently still posing as A.W., arranged for Gregory to come retrieve the DVD player from the front porch, which would avoid the need for Gregory to enter A.W.'s trailer or otherwise interact with defendant and A.W. When Gregory came to retrieve the DVD player, defendant forced A.W. into the bedroom and placed tights in her mouth to prevent her from yelling.

¶ 23    After Gregory retrieved the DVD player from the porch, defendant sexually assaulted A.W. again.  As A.W. described to Longfellow, defendant removed A.W.'s underwear (which she had apparently put back on), bent her over the bed, and attempted to have anal sex with her.  After A.W. told defendant that this hurt her, defendant had A.W. lie on her side.  Defendant then had vaginal intercourse with A.W., who was crying and telling him to stop.  (Longfellow testified that he "assumed" defendant had vaginal intercourse with A.W. while she was on her side because defendant's attempt to perform anal sex was "apparently" unsuccessful.)  Again, A.W. did not physically resist because she was afraid that defendant would use the knife against her.  During this second instance of intercourse, defendant punched A.W. in the chest above her right breast.

¶ 24    After the second instance of sexual intercourse, defendant and A.W. took a shower together.  Longfellow believed that the purpose of this second shower was to clean off menstrual blood, although A.W. never told Longfellow this.  By the time of the second shower, A.W. was becoming increasingly fearful and trying to think of a way to escape.  She began to "sweet talk" defendant to calm him down.  This made defendant angry.

¶ 25    A.W., who is a diabetic, convinced defendant to accompany her to her car so that she could retrieve her insulin.  A.W. and defendant, both wearing only towels, went outside to A.W.'s car.  While defendant was bending over into A.W.'s car looking for the insulin, A.W. took off running down the street toward her mother's trailer.  She fell several times while running, scraping her knees on the pavement.

¶ 26    Defendant chased A.W., who began screaming loudly.  Once A.W. began screaming, defendant retreated back to A.W.'s trailer, and A.W. was able to reach her mother's

trailer. A.W. banged loudly on her mother's door, but no one answered. She then went to Gregory's trailer, which was also in Royal Acres. Gregory let her inside and provided her with clothing. Shortly thereafter, defendant began knocking on the door of Gregory's trailer, looking for A.W. Gregory told A.W. to hide in the back of his trailer. After Gregory spoke to defendant, Gregory told A.W. that he did not "want to be in the middle of all this," and he made A.W. leave his trailer through the back door. A.W. left Gregory's trailer and attempted to go back to her mother's trailer. However, as Longfellow explained, defendant "kind of stepped out of the shadows and confronted her again."

¶ 27　　　　A.W. began running again. She fell on the pavement, at which point defendant "began kicking her in the butt and the legs and the back area." A.W. started screaming. Gregory exited his trailer and pulled defendant away. A.W. was able to get up and continue running, but she fell again, and defendant broke free from Gregory. Defendant again kicked A.W. in the buttock, legs, and back. (Longfellow was unable to find any bruises on A.W.'s buttock, legs, or back.) Again, Gregory pulled defendant off A.W., and A.W. got up and ran away. A.W. finally made it to the safety of her mother's trailer. (We note that A.W. testified on direct examination, and stated during the 9-1-1 call, that she went to her grandfather's trailer.)

¶ 28　　　　　　　　　　　C. Defendant's Arrest

¶ 29　　　　A few hours after the incident, officers located and arrested defendant, who was shirtless and attempting to enter Gregory's trailer through the back door. A search of defendant's person revealed (1) two cell phones in defendant's pocket (one of which was A.W.'s) and (2) a crumpled up, bloodstained white shirt, which had been stuffed into defendant's pant leg. Defendant had blood on his pants and hands as well.

¶ 30                    D. Physical Evidence and Photographs

¶ 31          Detectives searched A.W.'s cell phone. Among the media files were two short videos, each only a few seconds long and recorded just before midnight on September 6, 2012. The videos depicted A.W. standing naked in her trailer and crying. The trial court admitted the videos into evidence.

¶ 32          Detective Brian Williams, an evidence technician for the Normal police department, testified that he arrived at A.W.'s trailer on September 7, 2012, and collected the following pieces of physical evidence: (1) a pair of women's panties lined with a menstrual pad; (2) a pair of tights; (3) a white towel containing bloodstains; (4) a pair of men's boxer shorts containing bloodstains on the crotch area; (5) a tan towel found next to the boxer shorts; and (6) a white towel, which another officer recovered from Gregory's trailer. The trial court admitted the aforementioned exhibits into evidence.

¶ 33          Williams also took photographs inside A.W.'s trailer, focusing on things that A.W. identified as being "out of place." In addition to the aforementioned pieces of physical evidence admitted at trial, the images also showed (1) a small bloodstain on A.W.'s bedspread and (2) two kitchen knives—one serrated steak knife with a plastic handle and one slightly larger, straight-bladed chef's knife with a wooden handle—which Williams pulled from dirty dishwater in the sink—sitting side by side on the kitchen counter. The trial court admitted the photographs into evidence.

¶ 34                    E. Defendant's Police Station Interview

¶ 35          Detective Brian Larimore of the Normal police department testified that he interviewed defendant at the Normal police station on the morning of September 7, 2012. The

- 19 -

trial court admitted an audio and video recording of that interview, which was shown to the jury. We note that defendant's explanation of the sequence of events did not remain consistent throughout the 40-minute interview. In fact, it is impossible to piece together a single, coherent timeline of events based upon defendant's statements. As Larimore asked additional questions and sought clarification as to the order in which certain things happened, pieces of defendant's story would shift places or fall away altogether. Accordingly, although we do our best to summarize defendant's version of what happened, the sequence of events is unclear.

¶ 36 Defendant stated that A.W. invited him to her trailer to talk. The pair had been together for 2 1/2 years, and A.W. left the back door of her trailer unlocked for defendant, as she would often do. After being dropped off by his cousin, defendant smoked a blunt (cannabis rolled in a cigar wrapper) on the back porch of A.W.'s trailer. Defendant then went inside the trailer through the back door, entering just as A.W. returned from work through the front door. Defendant and A.W. talked and argued, apparently throughout the entire night and into the morning. Although defendant gave several explanations as to why the argument occurred, he ultimately admitted that the argument concerned A.W.'s relationship with Gregory.

¶ 37 A.W., who was pleading with defendant not to argue, took defendant by the hand and led him into the bedroom. There, A.W. told defendant to sit on the bed, then climbed on top of him and began having intercourse. (At a different point in the interview, defendant stated that he was on top of A.W. during this first instance of sex.) Throughout the sex, defendant was texting Gregory from A.W.'s cell phone, pretending to be A.W. After the first instance of sex, the couple argued more. Defendant "grabbed" A.W. during the argument, leaving a bruise on her back. A.W. cried. A.W. initiated a second round of consensual sex, beginning with her

- 20 -

performing oral sex on defendant, followed by vaginal intercourse.

¶ 38    During the interview, Larimore asked defendant, "at what point did a knife come into play tonight?" Defendant, after pausing for several seconds and appearing perplexed by the question, eventually stated that he held a "butter knife" to his abdomen and threatened to stab himself so that A.W. would "get [his] point." Defendant acknowledged that this probably scared A.W. and may have influenced her willingness to engage in sexual acts. Defendant could not remember what he did with the knife after he put it to his abdomen.

¶ 39    At certain points in the interview, defendant stated that he and A.W. showered together after the first instance of sex. At other times, he stated they showered after the second instance of sex. Later in the interview, defendant stated that A.W. showered alone before any sex occurred, followed by a mutual shower after sex. The shower (or showers) took place because A.W. was menstruating during sex.

¶ 40    According to one version of defendant's story, after the second instance of sex, A.W. told defendant to leave. Defendant refused to leave, and, following some additional arguing, A.W. left. In another version, defendant and A.W. got out of the shower together (after the second instance of sex) and defendant found a text from Gregory on A.W.'s cell phone, which prompted A.W. to flee the trailer.

¶ 41    After A.W. left her trailer, defendant remained inside for a while before going to Gregory's trailer, where he saw A.W. exiting from the back door. When A.W. saw defendant, she began running. She fell on the pavement and started yelling. Defendant grabbed at A.W., leaving a mark. Gregory came out of his trailer and told defendant to leave A.W. alone.

¶ 42    Midway through the interview, Larimore made the following statement to

defendant:

> "There's a couple of things that aren't making sense to me. Some of the things you're saying, I believe you're being honest about. But you are not being honest about everything.
>
> * * *
>
> I've interviewed more people than I can count, okay? And I've talked to people that have been 100% honest with me. I've been—I've talked to people that have been 0% honest with me. Everything that came out of their mouth was a lie. And I've—most of the people that I've talked to tell some truth and some dishonesty, okay?
>
> * * *
>
> For something that happened this recently, you seem to not remember anything. Every question I ask you, you're taking forever to remember."

After Larimore made those remarks, defendant suggested the marijuana he smoked before A.W. came home (at approximately 10:45 p.m.) was to blame for his difficulty answering questions. Larimore pointed out that it was 6 a.m. and defendant might just be tired. Defendant disagreed and told Larimore that he was "wide awake." Defendant then purported to retell his story "from step one."

¶ 43 Defendant admitted to "putting [his] hands on" A.W., specifically, "hitting her in the side." He also admitted to "holding her against her will" by standing in the doorway to

prevent her from leaving and saying, "you ain't going nowhere."  However, defendant adamantly denied committing home invasion or any type of sexual assault.  Referring to the sex, defendant told Larimore, "this was something she wanted to do too, man.  *** You don't know her like I do.  *** This was her doing."  Defendant told Larimore that A.W. enjoyed having sex while she was on her period, stating, "that's her best time."  A.W. never told defendant to stop or said "no." She told defendant, "Baby, I'll do whatever you want me to do."

¶ 44                      F.  Defendant's Jailhouse Phone Calls to A.W.

¶ 45          Larimore testified that he planned to interview A.W. on the morning of September 7, 2012, after she completed a sexual assault examination at a local hospital.  However, a shooting at a local high school drew Larimore away from the investigation in this case. Thereafter, Larimore made several unsuccessful attempts to contact A.W. to complete an interview.  Larimore, suspecting that defendant had contacted A.W. to dissuade her from speaking with detectives, inspected jailhouse phone-call recordings.  The trial court admitted 13 audio recordings of phone calls defendant made from the McLean County detention center to A.W. between September 10, 2012, and September 21, 2012.  (By stipulation, typed transcripts of those phone calls were provided to the jury.  We set forth the pertinent portions of those phone calls, in detail, exactly as they appeared in the typed transcripts.)

¶ 46          The following pertinent conversation took place on September 10, 2012, at 2:43 p.m.:

              "[DEFENDANT]:  Man *** they said I was in your house
              and when you walking in there I had a knife in my hand and put
              the knife up to you.  Come on man I didn't do that to you.

- 23 -

[A.W.]:  That aint what I told em.  \*\*\* I didn't tell em you was in the shower with a knife.  I told em you got them later.  \*\*\* I'm gonna do what I'm gonna do to try and get you out of it.

\* \* \*

[DEFENDANT]:  \*\*\*  I never put once put it put it up to you.  I never once did that put in on your skin.

[A.W.]:  [Y]ou didn't when we was layin in here on the bed?  You didn't put that knife up to me?

[DEFENDANT]:  No.  No.  Not once.  \*\*\*  [B]ut you you didn't say that though?

[A.W.]:  Say what?

[DEFENDANT]:  I do whatever you want me to do?  You didn't say that?

[A.W.]:  Yeah, cause you had a knife to me.

[DEFENDANT]:  Oh man don't do that over this phone.  Like you just gonna—

[A.W.]:  \*\*\* [O]kay well don't talk about that then cause you already know.  I'm not gonna lie about it.  But like I said I'll do what I can to get it took off.  \*\*\*  I'll do whatever I can.

\* \* \*

[DEFENDANT]:  I don't wanna talk about it over this phone man.  My whole life's gone.

- 24 -

[A.W.]: So what do you want me to say?

[DEFENDANT]: Just tell em you lied about all of it that you were just mad and you lied about everything.

* * *

[A.W.]: Well, that's what I'll tell the lady but if they're talkin about doin this and this to me I'm not doin it.

[DEFENDANT]: Then what else can you do then? Just let me go.

[A.W.]: Tell her I don't wanna press no charges. *** I'll call her back.

[DEFENDANT]: Well, go do it now, and I'll call you back. *** Do it for me girl, don't let me rot up in here man.

[A.W.]: Yeah okay."

¶ 47    The following conversation took place about 25 minutes later:

"[DEFENDANT]: *** What they say?

[A.W.]: The lady wasn't there to talk to me right now.

* * *

[DEFENDANT]: You gotta get on that for me man. Come on man don't let me do 60 man don't let me do all them mother fuckin years behind these bars man.

[A.W.]: I told you I was.

[DEFENDANT]: What's up though man you hate me now?

[A.W.]: No.

[DEFENDANT]: I know you don't love me no more but.

[A.W.]: I hate what you did.

[DEFENDANT]: I apologize for what I did.

* * *

[A.W.]: Just know what you did is crazy.

[DEFENDANT]: What?

[A.W.]: I said you just know what you did is bogus.

[DEFENDANT]: Come on man I'm in (inaudible) took you through that and I ain't never did shit to you man. I ain't never did shit. *** Come on man I just blacked out for a minute ***."

¶ 48 The following conversation took place about 1 hour and 20 minutes later:

"[DEFENDANT]: [W]hy you doin me like this girl?

* * *

[A.W.]: So this is my fault?

[DEFENDANT]: No *** you don't deserve nothin cause I really didn't do nothin but kick ya. That's all I did was kick ya and hit ya and punch ya ***.

[A.W.]: I got a bruise on my chest, 2 bruises on my chest I got one on my back my feet and knees are all scratched up.

[DEFENDANT]: Don't talk about all that on the phone.

[A.W.]: Well you started talkin about it actin like you ain't

- 26 -

did nothin."

¶ 49   The following conversation took place about one hour later:

"[DEFENDANT]:  I apologize to you.  I'm sorry for everything girl.  I just didn't know how to express how much I wanted you to know that how much I loved you.  That's all that was girl.

*** 

[A.W.]:  You know you don't have to say that to get me to drop the charges.  I'm gonna do it anyway. *** You about had me pee on myself when you opened that shower curtain.

[DEFENDANT]:  I ain't even know you was in there.

***

[A.W.]:  *** [H]ow long was you in the house before I even got there[?]

[DEFENDANT]:  You don't understand the front door was unlocked how you think because I was gonna sit on the porch.  But the front door was unlocked I just walked in the mother fucker.

[A.W.]:  Well I didn't leave it unlocked.

[DEFENDANT]:  And then I got home invasion.  Huh? I'm like wow.

[A.W.]:  I didn't leave it unlocked cause I just got the locks changed.  So what was I gonna leave it unlocked for?

[DEFENDANT]:  It was unlocked man.  It was unlocked cause real talk that mother fucker was unlocked.  How else I'm a get in there?

[A.W.]:  Cause you're you."

¶ 50    The following conversation took place two days later, on September 12, 2012, at 12:48 p.m.:

"[DEFENDANT]:  ***  I was just gonna wait til you come home but I just went on opened the door was the front door was unlocked all I did was turn the knob it just came open.  I walked straight back there I set up in there I'm like man what I'm thinkin bout was she gonna hit me with this or she man these people these bitches talkin bout they got charges on me rapin an anal.  Rapin. I'm like huh come on man you the one that that said man I do said come on let's go in the room and we went in the room and we did that.  Didn't we or didn't we not but didn't you or didn't you not do that?

[A.W.]:  No not that first and second time.

[DEFENDANT]:  The second time right?

[A.W.]:  ***  Don't do that.  You know I didn't want to.

[DEFENDANT]:  Man but you you aint—

[A.W.]:  ***  [A]nd of course I'm gonna say I'll do anything you want me to do.  You know how scared like I said you know

how scared I was?

> [DEFENDANT]: Man but you just you you really tryin to bury me man. *** And then it's like you ain't tryin to show no effort of really goin up there. *** Go on call up there man and see what they sayin man and tell them that you really need to get get somebody to drop this shit cause you don't wanna go through it no more. You're not comin to court or none of that. Just call em real quick and I'll just call you back."

A.W. told defendant that she wished Gregory would have been with her when she arrived home on the evening of the incident. Defendant responded, as follows:

> "[DEFENDANT]: You know what girl I'm a be straight up with ya what I had on my mind if I would of seen that it was gonna be an ugly sight man. It was gonna be an ugly sight man and I ain't talkin bout just no no no it was just gonna be ugly that's all I gotta say.
>
> [A.W.]: *** [W]orse that what already happened?
>
> [DEFENDANT]: Yeah it would have been worser than that man because I cause I was really tryin to get down to the nitty gritty of that shit man. So thank God I didn't."

¶ 51    The following conversation took place later in the evening of September 12, 2012, at 9:11 p.m.:

> "[A.W.]: [T]he sheriff just came and served me with a

- 29 -

subpoena.

[DEFENDANT]:  Oh that's for the Grand Jury.  ***  When you go just say you plead the fifth.  No this didn't happen and that didn't happen man.  You just wanna drop all the charges all you gotta do.  They can't do nothin to ya.  Okay?

[A.W.]:  What about all the stuff they got from the house?

[DEFENDANT]:  Don't worry bout that that ain't nothin that can be throwed away man.  I tell you how it gonna go.  ***  Just make sure you just do plead the fifth on everything.  Tell them you don't even want to go through it with.  Okay?

[A.W.]:  Yeah."

¶ 52    The following conversation took place three days later, on September 15, 2012:

"[DEFENDANT]:  So what you gonna do in court then? *** [W]hat you gonna say?

[A.W.]:  *** I been runnin things through my head I thought about sayin you know maybe things got a little out of hand and I just get scared too easy and I blew it out of proportion and I don't know.

[DEFENDANT]:  *** I'll take the domestic charge man. *** I take the 6 years on that man.  If you wanted to say man drop the uh the home invasion and the uh rape man.

[A.W.]:  Yeah. "

¶ 53    The following conversation took place six days later, on September 21, 2012:

"[DEFENDANT]:  Yeah man just leavin me out there in the cold huh?

[A.W.]:  *** I've been sittin here cryin all day.

[DEFENDANT]:  Bout what?  What's wrong with ya? What's wrong?

[A.W.]:  Because of what they're tryin to get you.

[DEFENDANT]:  I know man I'm fucked.  It'll be over with for me man.  *** I'm fucked but I'm good though.

[A.W.]:  I've been lookin up stuff about how much time I get about filing a false police report and everything.  I don't know what to do.

[DEFENDANT]:  All they'll do is hit you with it's perjury and that ain't nothing but a misdemeanor and they ain't ain't really gonna do shit to ya.

[A.W.]:  I don't know what to do.  I'm sorry.

* * *

[DEFENDANT]:  *** [O]nly thing I can tell you to do is just call up here and just tell em you want do I mean it was just a false police thing and *** I ain't do none of that shit to ya.  *** [T]hey can't get you for nothin."

¶ 54    After the jailhouse phone calls were played for the jury, the State rested its case.

- 31 -

Defendant did not present evidence.

¶ 55                    G.  Closing Arguments and Jury Deliberation

¶ 56        During its closing argument, the State discussed Longfellow's testimony about what A.W. told him, as follows:

> "[T]he things that [A.W.] told Officer Longfellow matched the things that were at that scene, bloody towels, bloody boxer shorts, her underwear with a pad still in it, the tights that he shoved in her mouth when Greg came to pick up the DVD player.  It was all there.

> * * *

> And you heard what Officer Longfellow said.  [A.W.] told Officer Longfellow that night that the defendant was gritting his teeth and looked—looked angry, and when he stepped out of the shower, he came at her.

> Now, as I described before, the scene, back to what she told Officer Longfellow, the blood on the bed, the underwear on the floor, the tights that he made her shove in her mouth when Greg came to get the DVD player, the knives that were found in her apartment readily accessible to the defendant, a bloody towel, another towel and a pair of boxer shorts with blood on them, a close-up of the towel and the boxer shorts *** it matches exactly what she told the officers."

- 32 -

The State also argued that defendant's admissions regarding text messages confirmed the story that A.W. told Longfellow.

¶ 57　　　　Defense counsel conceded in closing argument that defendant committed the charged domestic batteries, but he argued that the State failed to prove defendant guilty of the remaining charges.

¶ 58　　　　During deliberations, the jury requested a transcript of Longfellow's testimony, which the trial court provided after defense counsel stated that he had "no particular objection to [the jury] reviewing a transcript."

¶ 59　　　　The jury found defendant guilty on all counts: (1) one count of home invasion; (2) three counts of aggravated criminal sexual assault with a weapon (two involving vaginal penetration and one involving anal penetration); (3) three counts of domestic battery; and (4) one count of aggravated unlawful restraint.　In March 2013, the trial court sentenced defendant to an aggregate prison term of 95 years for those convictions (consecutive sentences of 20 years for home invasion and 25 years each for the three aggravated criminal sexual assaults, to be served concurrently with a 5 year sentence for aggravated unlawful restraint and 3 year sentences for each of the three domestic batteries).　The court also sentenced defendant to 6 years in prison in case No. 12-CF-1020 (in which he pleaded guilty to harassment by telephone and violation of a bail bond), to be served consecutively to the aforementioned sentences in case No. 12-CF-891, resulting in a total of 101 years in prison.

¶ 60　　　　These appeals followed, which we consolidated.　(We note that defendant raises no issues on appeal regarding his convictions or sentences in case No. 12-CF-1020.)

¶ 61　　　　　　　　　　　　　　　II.　ANALYSIS

¶ 62    On appeal, defendant argues that he was denied a fair trial because (1) the trial

court improperly admitted, as substantive evidence under section 115-10.1 of the Code, A.W.'s

hearsay statements to Longfellow; (2) the State presented improper opinion testimony from

Longfellow and Larimore regarding A.W.'s and defendant's credibility; and (3) the State failed to

present sufficient evidence to sustain defendant's conviction for home invasion.  We address

these claims of error in turn.

¶ 63                              A.  Section 115-10.1 of the Code

¶ 64    Section 115-10.1 of the Code provides as follows:

"Admissibility of Prior Inconsistent Statements.  In all criminal

cases, evidence of a statement made by a witness is not made

inadmissible by the hearsay rule if

        (a) the statement is inconsistent with his testimony

at the hearing or trial, and

        (b) the witness is subject to cross-examination

concerning the statement, and

        (c) the statement—

                (1) was made under oath at a trial, hearing,

or other proceeding, or

                (2) narrates, describes, or explains an event

or condition of which the witness had personal

knowledge, and

                        (A) the statement is proved to have

been written or signed by the witness, or

(B) the witness acknowledged under

oath the making of the statement either in

his testimony at the hearing or trial in which

the admission into evidence of the prior

statement is being sought, or at a trial,

hearing, or other proceeding, or

(C) the statement is proved to have

been accurately recorded by a tape recorder,

videotape recording, or any other similar

electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent

statement inadmissible for purposes of impeachment because such

statement was not recorded or otherwise fails to meet the criteria

set forth herein."  725 ILCS 5/115-10.1 (West 2012).

¶ 65        The purpose of section 115-10.1 of the Code is to " 'protect parties from turncoat witnesses' " who, while on the stand at trial, disown a prior statement by testifying differently or professing inability to remember the subject matter.  *People v. Fauber*, 266 Ill. App. 3d 381, 390-91, 640 N.E.2d 689, 695 (1994) (quoting Robert J. Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 640-41 (1984)).  If the enumerated statutory conditions are met, the statute allows a witness's prior inconsistent statement to be admitted as substantive evidence.

¶ 66    More than 15 years after the General Assembly enacted the statute, the author of

this opinion noted that "even experienced trial courts face serious uncertainties when applying

section 115-10.1 of the Code." *People v. Edwards*, 309 Ill. App. 3d 447, 457, 722 N.E.2d 258,

265 (1999) (Steigmann, J., specially concurring). Now, more than 30 years after the statute's

enactment, seasoned attorneys and trial judges still regularly mishandle section 115-10.1 issues

when they come up at trial. To help clear up the confusion about the appropriate use of section

115-10.1(c)(2)(B) of the Code, which addresses a witness's acknowledgement of her prior

inconsistent statement, we provide the following detailed explanation regarding the proper

procedure to be followed under subsection (c)(2)(B).

¶ 67                    1. *Admitting a Prior Inconsistent Statement Under*
                       *Subsection (c)(2)(B)—the "Acknowledgement" Provision*

¶ 68    Proper admission of a prior inconsistent statement under section 115-10.1 of the

Code requires the proponent to first lay a foundation. "Laying the foundation for the admission

of a prior inconsistent statement as substantive evidence under section 115-10.1 of the Code is

essentially the same as laying the foundation to impeach a witness with his prior inconsistent

statement." *Id.* The Second District has explained the purpose of the confrontation requirement,

as follows:

> "The witness must have an opportunity to explain the
>
> inconsistency before the introduction of extrinsic evidence of the
>
> statement; this requirement prevents unfair surprise and gives the
>
> witness an opportunity to explain any inconsistency. [Citations.]
>
> Through this process, the opponent to admission of the statement is
>
> properly alerted to the existence of the statement and thus is able to

- 36 -

cross-examine the witness regarding it." *People v. Hallbeck*, 227

Ill. App. 3d 59, 62, 590 N.E.2d 971, 972-73 (1992).

¶ 69        Before the proponent of a prior inconsistent statement can begin to lay a

foundation, however, he or she must make the following determination: how can I ultimately

present the prior inconsistent statement to the jury? If the prior statement cannot be presented to

the jury in the form of (1) the witness's sworn testimony from an earlier proceeding (725 ILCS

5/115-10.1(c)(1) (West 2012)), (2) a statement written or signed by the witness (725 ILCS 5/115-

10.1(c)(2)(A) (West 2012)), or (3) an electronic recording (725 ILCS 5/115-10.1(c)(2)(C) (West

2012)), then the proponent's only remaining option is to present the prior inconsistent statement

to the jury by having the witness acknowledge, under oath, having made the prior statement (725

ILCS 5/115-10.1(c)(2)(B) (West 2012)). (We note that, as with all prior inconsistent statements

under subsection (c)(2), a prior inconsistent statement may not be admitted under subsection

(c)(2)(B) unless it "narrates, describes, or explains an event or condition of which the witness

had personal knowledge." 725 ILCS 5/115-10.1(c)(2) (West 2012); see also *People v. Simpson*,

2015 IL 116512, 25 N.E.3d 601, wherein the supreme court recently explained what the term

"personal knowledge" under section 115-10.1(c)(2) means.)

¶ 70        When counsel seeks to offer a prior inconsistent statement by way of

acknowledgement under subsection (c)(2)(B), the following general procedure should be

followed.

¶ 71        a. "Acknowledgement Hearing" Outside the Presence of the Jury


¶ 72        To avoid potential prejudice, the jury should not be present when the party

seeking to offer the statement under subsection (c)(2)(B) first confronts the witness with the prior statement for purposes of obtaining the witness's acknowledgement that she made the statement. This is because if the proponent recites the prior statement in front of the jury for the purpose of asking the witness whether she made the statement, the jury will hear the statement before the acknowledgement requirement of subsection (c)(2)(B) has been satisfied. However, if the witness does *not* acknowledge making the statement after being confronted with it, the statement is inadmissible as substantive evidence. In this scenario, the jury has nonetheless heard the potentially damaging contents of the statement, and depending upon its prejudicial effect, reversible error may have occurred.

¶ 73    Further, we note that if a witness's prior inconsistent statement is incriminating to the defendant, it is *not* admissible for mere impeachment of the witness. See *People v. Cruz*, 162 Ill. 2d 314, 362, 643 N.E.2d 636, 659 (1994) ("Now that a party can admit into evidence a 'turncoat' witness' prior inconsistent statement by complying with section 115-10.1, the introduction of oral inconsistent statements under the guise of impeachment should be foreclosed."). The only exception to this rule is if the witness's trial testimony affirmatively damages the State's case. See *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 57, 974 N.E.2d 352. On this point, we emphasize that "a witness's professed lack of memory, standing alone, does not 'affirmatively damage' a party's case for the purpose of impeaching one's own witness." *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 45, 966 N.E.2d 1215. "It is insufficient that a witness merely disappoints the State by failing to incriminate the defendant." *People v. McCarter*, 385 Ill. App. 3d 919, 933, 897 N.E.2d 265, 278 (2008).

¶ 74    To avoid letting the jury hear a prior inconsistent statement before the witness

renders the statement admissible by acknowledging making it, the better practice is to conduct what we will refer to as the "acknowledgement hearing" outside the presence of the jury. At the acknowledgement hearing, the proponent of the prior statement should confront the witness with the prior statement. This court has explained the basic component of such confrontation, as follows: "Normally, when a prosecutor attempts to lay the foundation for the admissibility of a prior inconsistent statement under section 115-10.1(c)(2)(B) of the Code, the prosecutor would establish the time, place, and date of the statement and then ask the witness whether she made the statement at issue." *People v. Sykes*, 2012 IL App (4th) 100769, ¶ 37, 968 N.E.2d 174. Importantly, this process must be repeated for *all* of the witness's *specific* prior statements that the proponent may wish to offer as substantive evidence under subsection (c)(2)(B). In other words, the witness must be confronted with, and acknowledge making, each of the specific prior statements sought to be admitted as substantive evidence. Further, this acknowledgement must be linked to the contents of a specific statement. It is not sufficient, for example, if the witness merely acknowledges the subject matter of a prior conversation that she had with another person.

¶ 75 After the witness has been confronted with, and given an opportunity to acknowledge making, her prior statements at the acknowledgement hearing, the proponent will know which, if any, of the prior statements may be admissible under subsection (c)(2)(B) based upon the witness's acknowledgement.

¶ 76 b. The Witness' Trial Testimony Is Inconsistent With an Earlier Statement That the Witness Acknowledges Making at the Acknowledgement Hearing

¶ 77 Assuming that at the acknowledgement hearing the witness acknowledges making a certain statement, the acknowledged statement is still not admissible until the witness testifies *inconsistently* with it in the presence of the jury once the trial resumes. 725 ILCS 5/115-10.1(a)

- 39 -

(West 2012).  Once that happens, the proponent can repeat, in the presence of the jury, what he had just done outside the presence of the jury at the acknowledgement hearing—namely, confront the witness with the specific prior inconsistent statement and ask the witness whether she made the statement.

¶ 78    If the witness acknowledges in the presence of the jury having made the prior inconsistent statement, that acknowledgement constitutes the evidence of the prior inconsistent statement for purposes of subsection (c)(2)(B), and nothing more need be done for the prior inconsistent statement to be admitted as substantive evidence.  In that instance, the prior inconsistent statement has been admitted as substantive evidence through the witness's acknowledgement in open court of having made the statement, and the jury has heard it.  However, in the unlikely event that the witness changes her answer once the jury comes back into the courtroom, and, contrary to what she had just said at the acknowledgement hearing, denies having made the prior inconsistent statement, the pertinent portion of the transcript of the acknowledgement hearing needs to be presented to the jury as evidence of the prior inconsistent statement, which is then admissible substantively.

¶ 79    c. Trial Surprises—Testimony Inconsistent With Prior Statement:
The Midtrial Acknowledgement Hearing

¶ 80    Although counsel will usually know ahead of time which witnesses are likely to testify inconsistently with their prior statements, it is possible that a witness may surprise counsel at trial.  If no acknowledgement hearing had been held prior to the witness's testifying in the presence of the jury and the witness surprises the questioner by testifying inconsistently with a prior statement, the questioner may ask the trial court (at a sidebar) to excuse the jury for the purpose of holding an acknowledgement hearing.  To avoid shuffling the jury back and forth

each time a new inconsistency arises during the witness's testimony, the court may direct the proponent of the prior inconsistent statement to complete his examination of the witness before the acknowledgement hearing takes place. That way, the acknowledgement hearing can be targeted at only the witness's prior statements that were inconsistent with the witness's testimony at trial. If, after confrontation at the acknowledgement hearing, the witness acknowledges making a prior inconsistent statement, the jury can be brought back into the courtroom, at which time the proponent can again confront the witness with the prior statement and ask the witness whether she made that prior statement. Again, if the witness does not acknowledge making the prior inconsistent statement when the jury is present, the transcript of the acknowledgement hearing can provide the evidence of her prior inconsistent statement, which is then admissible substantively.

¶ 81          d. Procedural Concerns Regarding Acknowledgement Hearings

¶ 82          Contrary to what happened in this case, in which Longfellow's testimony provided the evidence of A.W.'s prior inconsistent statements, a witness's prior inconsistent statements should not be admitted under subsection (c)(2)(B) through the testimony of another live witness. Instead, the declarant witness's *acknowledgement* of having made the prior inconsistent statement is the means by which the statement comes in as evidence, which is then admissible substantively. Accordingly, having another witness testify about the same prior inconsistent statement will simply be cumulative. Put another way, once the jury hears the witness acknowledge that she made a specific prior inconsistent statement, no need exists for another witness to repeat that same statement as he remembers hearing it.

¶ 83          We also note that whether the acknowledgement hearing occurs before or after the

witness testifies in front of the jury will depend mostly upon practical considerations. If the proponent, in advance of trial, has reason to believe that a witness will testify at trial inconsistently with the witness's prior statements, holding the acknowledgement hearing before the witness is examined in the presence of the jury may be advantageous. That way, assuming the proponent has then obtained the witness's acknowledgement as to certain specific prior statements, the proponent can offer those prior statements as substantive evidence if the witness testifies inconsistently with the prior statements in the presence of the jury. As already explained, offering the acknowledged prior inconsistent statement simply entails repeating what was done at the acknowledgment hearing—namely, confronting the witness with the prior inconsistent statement and asking the witness whether she made the statement. Again, if the witness refuses to acknowledge making the statement in the presence of the jury, the transcript of the acknowledgement hearing can serve as the means of offering the witness's acknowledgement of the statement into evidence.

¶ 84 The quantity of prior statements at issue will also affect the planning of the acknowledgement hearing. If, as in the present case, the proponent has reason to believe that a witness will testify at trial inconsistently with an entire narrative of events that the witness previously provided to another person (in this case, A.W.'s prior statements to Longfellow about what happened in the trailer over the course of several hours), a lengthy acknowledgement hearing will likely prove necessary.

¶ 85 As a last matter regarding acknowledgement hearings, we note the Practice Tip for how to conduct acknowledgement hearings, which can be found at the beginning of section 10:43 of volume 2 of the 2014-2015 Cumulative Supplement of Robert J. Steigmann and Lori A.

Nicholson, Illinois Evidence Manual, § 10:43 (4th ed. 2006).

¶ 86                             2. *The Errors in This Case*

¶ 87          In this case, while A.W. was under oath on the witness stand in the presence of the jury, the State asked her the following questions:

"[THE STATE]: [Y]ou talked to an officer on September 7th, [2012,] is that correct?

[A.W.]: Yes, I believe I talked to several of them.

[THE STATE]: Okay. You actually even walked an officer through your house. Is that right?

[A.W.]: I might have. I don't remember that neither.

[THE STATE]: And when you talked to that officer and walked them through, you even pointed out certain evidence about things that happened that night. Is that right?

[A.W.]: I—I guess so. I don't recall it[.]

* * *

[THE STATE]: Now, when you talked to the officer, you gave him details about what happened between you and the defendant that night, correct?

[A.W.]: If I would have did it that night, then I probably would have remembered that night if I did give him details. I just don't remember what happened now.

[THE STATE]: Did you tell him that night what

- 43 -

happened?

> [A.W.]: I guess so. I can't say for sure because I don't
> remember."

¶ 88　　　　Later in the trial, when the State began asking Longfellow about statements that A.W. made to him, defense counsel objected on the ground that A.W. was neither "questioned about a detailed interview that she gave with [Longfellow]" nor "confronted with these alleged statements." The State responded to that objection, as follows:

> "Your Honor, she testified under oath that she believed that
> she had talked to the officers, that she does not remember what she
> told the officers. And she did say that what she told the officers
> would have been truthful, basically saying that she would not have
> lied to the officers."

The trial court overruled defense counsel's objection, finding that A.W. had acknowledged making the prior statements at issue:

> "The witness did acknowledge, that being [A.W.], that she spoke
> with officers. She could not recall which ones, but she indicated
> she did speak with someone. She just couldn't remember whom it
> was. In the court's view, that's somewhat sketchy, but it is an
> acknowledgement under oath that she made statements."

¶ 89　　　　In *Sykes*, this court held that "[t]he term 'acknowledged' in [section 115-10.1(c)(2)(B) of the Code] is not a term of art, having only one precise meaning. Instead, whether a witness's testimony constitutes an acknowledgement within the meaning of section

115-10.1(c)(2)(B) is a matter left to the trial court's sound discretion \*\*\*." *Sykes*, 2012 IL App (4th) 100769, ¶ 35, 968 N.E.2d 174. In this case, however, we agree with defendant's claim that the trial court erred by finding that A.W. acknowledged the statements at issue.

¶ 90 Although A.W. arguably acknowledged *talking* to police officers about the incident, her testimony came nowhere close to satisfying the acknowledgement requirement of subsection (c)(2)(B) of the statute. Even if A.W. had unambiguously acknowledged that she gave Longfellow a detailed account of what happened inside the trailer, such an acknowledgement would still be insufficient because section 115-10.1 of the Code speaks in terms of *statements*, not references. That is, A.W. needed to be confronted *with what she actually said to Longfellow*, not just a reference that she spoke with him. Because A.W. was never confronted with the contents of a single specific statement that she allegedly made to Longfellow, her testimony at trial completely failed to meet the acknowledgement requirement of section 115-10.1(c)(2)(B) of the Code. Accordingly, Longfellow's testimony about what A.W. told him was not admissible under section 115-10.1(c)(2)(B) of the Code.

¶ 91 The State argues in its brief to this court that because A.W. claimed to not remember speaking with Longfellow, "the State was not required to engage in the superfluous task of confronting her with her specific statements she made to Longfellow." We disagree. By its plain terms, subsection (c)(2)(B) provides that a prior inconsistent statement is not admissible unless "the witness acknowledged under oath the making of the statement." 725 ILCS 5/115-10.1(c)(2)(B) (West 2012). Under subsection (c)(2)(B), a witness can acknowledge under oath the making of a particular statement only when the witness has first been confronted with the actual contents of that statement. In other words, what the proponent asserts that the witness had

- 45 -

actually said.

¶ 92       We recognize that properly admitting a prior inconsistent statement under subsection (c)(2)(B) may be a somewhat laborious procedure for the parties, witnesses, and trial court to undertake in the midst of a jury trial.  However, section 115-10.1 permits no shortcuts for prior inconsistent statements to become admissible substantively.  Further, we note that, as in the present case, the need to conduct acknowledgment hearings will usually arise only because police officers in the field have failed to preserve a witness's statements by using one of the methods set forth in section 115-10.1 of the Code, such as obtaining a written or signed statement or creating an electronic recording.  As already mentioned, when Longfellow interviewed A.W. mere hours after this incident, she willingly provided him with a detailed narrative of what happened inside the trailer.  But Longfellow did not record that narrative or obtain a written or signed statement from A.W. setting forth what happened.  Perhaps unsurprisingly in this domestic violence case, A.W.'s willingness to cooperate with the prosecution did not last.  By the time of trial, no extrinsic evidence of A.W.'s prior statements existed, which meant that if A.W. testified at trial inconsistently with her earlier statements to Longfellow, the State could seek admission of those prior inconsistent statements only through appropriate use of section 115-10.1(c)(2)(B) of the Code.  Thus, when A.W. testified at trial inconsistently with what she told Longfellow, the State's only remaining option to get her statements to Longfellow before the jury was to conduct a *proper* acknowledgement hearing, as we discussed previously in this opinion.  But the State failed to do so, arguing instead that A.W.'s reference to her having talked to Longfellow about the incident somehow met the foundational requirements of section 115-10.1(c)(2)(B) of the Code.  The State's argument was wrong, and the

- 46 -

trial court erred by accepting it.

¶ 93        Neither Longfellow nor any of the other experienced police officers involved in this case sought to operate a recording device while A.W. walked them through her trailer and gave a detailed description of the alleged offenses that defendant had committed just hours earlier. This omission illustrates the continuing need for the training of Illinois law enforcement personnel so they will become familiar with the requirements of section 115-10.1 of the Code. State's Attorneys' offices should foster a close working relationship with their local law enforcement agencies to provide guidance on the effective use of section 115-10.1. That statute provides a valuable tool in the administration of criminal justice, but the State's Attorneys' offices will have difficulty wielding that tool effectively unless law enforcement personnel first do their part.

¶ 94        For the foregoing reasons, we conclude that Longfellow's testimony about what A.W. told him was inadmissible under section 115-10.1 of the Code, and the trial court erred by admitting that testimony.

¶ 95                              3. *Harmless Error*

¶ 96        The State contends that Longfellow's testimony about what A.W. told him, even if erroneously admitted, was harmless. We agree in part. Regarding defendant's conviction for aggravated criminal sexual assault based upon anal penetration, we conclude that the error was not harmless because the only evidence of anal penetration came from Longfellow's improper recitation of hearsay testimony. As to defendant's remaining convictions, we agree with the State that the error was harmless.

¶ 97        "The improper admission of evidence is harmless where there is no reasonable

probability that, if the evidence had been excluded, the outcome would have been different." *People v. Brown*, 2014 IL App (2d) 121167, ¶ 28, 11 N.E.3d 882.  We note that defendant argues that we should consider the erroneous admission of Longfellow's testimony harmless only if it appears *beyond a reasonable doubt* that the error did not contribute to the verdict.  However, this beyond-a-reasonable-doubt standard applies only when the erroneous admission of evidence implicates a constitutional protection (such as the confrontation clause, for example), whereas the reasonable-probability standard applies to evidentiary errors that are not constitutional in dimension.  *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104, 5 N.E.3d 328; *In re E.H.*, 224 Ill. 2d 172, 180, 863 N.E.2d 231, 235 (2006).  We apply the reasonable-probability standard in this case because the erroneous admission of Longfellow's testimony violated a rule of evidence— namely, the State presented an insufficient foundation for the admission of A.W.'s prior inconsistent statement under section 115-10.1(c)(2)(B) of the Code.

¶ 98           "When deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43, 902 N.E.2d 600, 617 (2008).  We view Longfellow's improper testimony about A.W.'s statements as largely cumulative in nature.  Except for the anal penetration element of one of defendant's aggravated criminal sexual assault convictions, the necessary elements of all the remaining convictions were established by other admissible evidence.  Based upon our review of the record, we conclude that (1) the other admissible evidence overwhelmingly supported defendant's remaining convictions and (2) no

reasonable probability exists that the jury would have acquitted defendant if Longfellow's improper testimony had been excluded.

¶ 99                              a.  Defendant's Remaining Convictions

¶ 100         The jury found defendant guilty of the following offenses, as set forth in the grand jury indictments and described in the jury instructions.  (We note that defendant does not challenge his domestic battery convictions, which we need not discuss.)

¶ 101         The jury convicted defendant of home invasion in that he, not being a police officer acting in the line of duty, without authority, knowingly entered A.W.'s dwelling place and remained in such dwelling place until he knew or had reason to know that one or more persons were present, and, while armed with a dangerous weapon, he used force or threatened the imminent use of force upon any person within the dwelling place.  720 ILCS 5/12-11(a)(1) (West 2010).

¶ 102         The jury convicted defendant of two identical counts of aggravated criminal sexual assault in that he committed an act of sexual penetration by placing his penis in A.W.'s vagina and used force or the threat of force by displaying, threatening to use, or using a dangerous weapon in a manner that led A.W. to reasonably believe, under the circumstances, that the object was a dangerous weapon.  720 ILCS 5/11-1.30(a)(1) (West 2010).

¶ 103         The jury convicted defendant of aggravated unlawful restraint in that he, while using a deadly weapon, knowingly and without authority detained A.W.  720 ILCS 5/10-3.1(a) (West 2010).

¶ 104                              b.  The Admissible Evidence Supporting
                                        Defendant's Remaining Convictions

¶ 105         The 9-1-1 call alone provided sufficient evidence to sustain defendant's

convictions for home invasion, two counts of aggravated sexual assault based upon vaginal penetration, and aggravated unlawful restraint. A.W. reported to the 9-1-1 dispatcher that defendant (1) was "hiding" in her shower when she arrived home; (2) "got the knives out of the drawer"; (3) "followed [A.W.] around everywhere [she] went so [she] couldn't leave"; (4) "made [A.W.] have sex with him twice" while she was menstruating; and (5) "punched [A.W.] in [her] back and then punched [her] in [her] chest." The physical evidence recovered from the scene, as well as A.W.'s bodily injuries, corroborated her 9-1-1 report.

¶ 106    Defendant's statements during the police station interview confirmed, among other things, that he (1) entered A.W.'s trailer, where he and A.W. remained for several hours; (2) held A.W. "against her will"; (3) physically battered A.W. inside the trailer; (4) had sexual intercourse with A.W. multiple times; (5) picked up a knife, which probably scared A.W. and influenced her willingness to engage in sex acts; and (6) chased A.W. down the street while she was wearing only a towel, hitting her when she was on the ground. Defendant also admitted that A.W. attempted to leave the trailer, but he physically blocked her from doing so.

¶ 107    Defendant's claim that he and A.W. had consensual sex makes no sense in light of the *undisputed* evidence that (1) defendant physically battered A.W. multiple times throughout the night, (2) defendant admitted in his interview that he held A.W. "against her will," (3) A.W. was crying throughout the night (as can be seen on the video that defendant recorded from A.W.'s cell phone, in which A.W. was standing naked and crying), and (4) A.W. fled from defendant in a panic after she was able to escape her trailer. Additionally, we note that A.W. (1) hid in Gregory's trailer while defendant looked for her, (2) testified at trial that she would not have willingly engaged in sexual intercourse while she was menstruating, and (3) mentioned to

- 50 -

defendant over the phone that she engaged in sex acts because defendant held a knife to her and she was scared.

¶ 108    The jailhouse phone calls between defendant and A.W. provide perhaps the strongest evidence of defendant's guilt. In discussing the State's charges and brainstorming how to defeat the prosecution's case, neither defendant nor A.W. ever entertained the idea of simply telling the truth about what happened. Instead, defendant's singular focus was to convince A.W. to either lie or say nothing. For example, defendant gave A.W. the following instructions for her grand jury testimony:

> "When you go just say you plead the fifth. No this didn't happen
> and that didn't happen man. You just wanna drop all the charges
> all you gotta do. They can't do nothing to ya. Okay?
>
> * * *
>
> [J]ust say you plead the fifth about everything. Every every
> question they ask you just say you plead the fifth."

¶ 109    We also note that at the time of the phone calls, defendant had been fully apprised of the State's allegations against him. The jury even listened to defendant recite some of the State's charges to A.W. over the phone. However, aside from some quibbling with A.W. over whether her trailer door was unlocked, defendant had very little to say in dispute of the overall truth of the State's allegations. At one particularly revealing moment in a phone call, defendant's question about a factual detail inadvertently prompted A.W. to openly discuss what actually happened:

> "[DEFENDANT]: I do whatever you want me to do? You

didn't say that?

> [A.W.]:  Yeah, cause you had a knife to me.
>
> [DEFENDANT]:  Oh man don't do that over this phone.

Like you just gonna—

> [A.W.]:  *** [O]kay well don't talk about that then cause

you already know.  I'm not gonna lie about it.  But like I said I'll do

what I can to get it took off."

The jailhouse phone calls bolstered the credibility of the State's case by revealing that defendant and A.W. shared knowledge of defendant's guilt.

¶ 110       We further note that defendant responded to the State's charges by cajoling A.W., his victim, to refuse to participate in this criminal case.  He largely succeeded in his efforts, and, in so doing, deliberately sabotaged the mechanism by which the courts search for truth and dispense justice.  For this reason, we have little sympathy for defendant's claim that he was denied a fair trial.  The centerpiece of a fair trial for defendant would have been direct testimony from A.W., the only other person who knew exactly what happened inside the trailer on the night in question.  By convincing A.W. to withhold that information, defendant demonstrated that he was not actually interested in a fair trial—he was interested in no trial at all.  His efforts to prevent the truth from coming out bolstered the credibility of the evidence supporting the State's factual allegations.  Longfellow's testimony, albeit improper, was a direct consequence of defendant's efforts to thwart the criminal justice system's search for truth.  Our conclusion that the jury would have convicted defendant even without Longfellow's testimony is based, in part, upon the natural inference that the jury could have drawn from defendant's efforts to silence the

only other person who could have revealed what actually happened.

¶ 111                              c.  Forfeiture by Wrongdoing

¶ 112        Indeed, an argument could be made that the admission of A.W.'s statements through Longfellow's testimony was not error at all because defendant deliberately sought to make A.W.'s direct testimony unavailable for the jury to hear.  Illinois Rule of Evidence 804(b)(5) provides as follows:

"**(b) Hearsay Exceptions.**  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

* * *

**(5) Forfeiture by Wrongdoing.**  A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."  Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011).

¶ 113        Illinois Rule of Evidence 804(a)(3) defines " '[u]navailability as a witness' " as including situations in which the declarant "testifies to a lack of memory of the subject matter of the declarant's statement."  Ill. R. Evid. 804(a)(3) (eff. Jan. 1, 2011).  In the present case, the "subject matter" of the statement of the declarant (A.W.) is the sexual assaults and other harm she suffered at the hands of defendant.  Defendant's cajolery succeeded in persuading A.W. not to testify at trial beyond the point at which she discovered defendant in her shower.  After that point, she claimed to be unable to remember what defendant did to her.

¶ 114 　　　　　We acknowledge that forfeiture by wrongdoing has typically been used in murder cases (see, *e.g.*, *People v. Hanson*, 238 Ill. 2d 74, 97, 939 N.E.2d 238, 252 (2010); *People v. Coleman*, 2014 IL App (5th) 110274, 24 N.E.3d 373; *People v. Peterson*, 2012 IL App (3d) 100514-B, 968 N.E.2d 204), but we see no reason why that doctrine should not apply in any case in which a defendant has succeeded in undermining the criminal justice system by preventing the trier of fact from hearing all pertinent testimony regarding the case on trial.  Certainly, defendant's repeated jailhouse phone calls to A.W. leave no doubt in this case of either his intent or his success in getting her not to testify.  See *People v. Hampton*, 406 Ill. App. 3d 925, 940, 941 N.E.2d 228, 240 (2010) (in a case involving charges of aggravated criminal sexual assault and home invasion in which the defendant and his mother colluded to convince a witness to " 'plead the fifth' " at trial, the appellate court affirmed the trial court's application of the doctrine of forfeiture by wrongdoing).

¶ 115 　　　　　However, the State has not argued that the doctrine of forfeiture by wrongdoing applies in this case.  Accordingly, because this issue has not been raised, and because we conclude that the admission of Longfellow's hearsay testimony was harmless error, we need not address whether defendant's wrongful efforts to keep A.W. quiet estop him from challenging Longfellow's testimony.

¶ 116 　　　　　Based upon the strength of the admissible evidence of defendant's guilt, we conclude that the erroneous admission of Longfellow's testimony was harmless error as to defendant's convictions for home invasion, aggravated criminal sexual assault based upon vaginal penetration, domestic battery, and aggravated unlawful restraint.

¶ 117 　　　　　　　　　　B.  Opinion Evidence on Credibility

¶ 118     Defendant next argues that the State solicited improper opinion testimony from (1) Longfellow regarding A.W.'s credibility and (2) Larimore regarding defendant's credibility.

¶ 119     Initially, we note that defendant forfeited his claims of error regarding this evidence by failing to object at trial.  See *People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7, 970 N.E.2d 90.  However, defendant contends that we should consider the merits of these claims because (1) the admission of the improper opinion evidence constituted plain error and (2) in the alternative, defense counsel rendered ineffective assistance by failing to (a) object to Longfellow's and Larimore's statements and (b) request a limiting instruction that Larimore's statements, if admissible, could be considered only for purposes of lending context to the statements that defendant made during the interview.  We disagree with each of these contentions.

¶ 120                                  1.  *Plain Error*

¶ 121     "The plain-error doctrine is a narrow and limited exception."  *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).  Under this doctrine, we will consider an unpreserved error if "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).  "In both instances, the burden of persuasion remains with the defendant."  *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 480 (2005).

¶ 122     Defendant proceeds under the first prong of the plain-error analysis, arguing that

- 55 -

the evidence was closely balanced because "[t]he trial was a credibility contest."  Specifically,

defendant asserts that (1) Longfellow's testimony improperly bolstered the credibility of the

inculpatory statements A.W. apparently made to Longfellow and (2) Larimore's comments

improperly diminished the credibility of the exculpatory statements that defendant made during

the police station interview.  We choose to begin our plain-error analysis by first addressing

whether any error occurred at all.  See *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1059 ("As a

matter of convention, our court typically undertakes plain-error analysis by first determining

whether error occurred at all.").

¶ 123                    a.  Longfellow's Comment on A.W.'s Credibility

¶ 124          Regarding A.W.'s credibility, defendant argues that Longfellow gave the

following improper testimony when the State asked him to describe A.W.'s demeanor:

"She was still in shock.  I mean it was just a very blank

stare.  She was scared, you know, talking about it, still trembling

but very believable, very credible."

¶ 125          We agree with defendant that Longfellow's testimony—in which he stated that

A.W. was "very believable, very credible" when she told Longfellow what defendant had done—

was clear and obvious error.  This court has described it as a "*fundamental rule* that one witness

should not be allowed to express his opinion as to another witness's credibility."  (Emphasis

added.)  *People v. Henderson*, 394 Ill. App. 3d 747, 754, 915 N.E.2d 473, 478 (2009).

"Questions of credibility are to be resolved by the trier of fact."  *People v. Kokoraleis*, 132 Ill. 2d

235, 264, 547 N.E.2d 202, 216 (1989).  Accordingly, " 'it is generally improper to ask one

witness to comment directly on the credibility of another witness.' "  *People v. Boling*, 2014 IL

- 56 -

App (4th) 120634, ¶ 121, 8 N.E.3d 65 (quoting *People v. Becker*, 239 Ill. 2d 215, 236, 940 N.E.2d 1131, 1143 (2010)).

¶ 126    We recognize that in this case, Longfellow volunteered his opinion as to A.W.'s credibility without the State's directly asking him to do so. (The State had simply asked Longfellow to describe A.W.'s demeanor.) This does not affect our conclusion. In *Boling*, a child sexual assault victim's out-of-court statements to a sexual assault nurse examiner were admitted pursuant to section 115-13 of the Code (725 ILCS 5/115-13 (West 2012)), which creates a hearsay exception in certain cases for a victim's out-of-court statements that are made for purposes of medical diagnosis or treatment. The nurse in *Boling*, while under direct examination by the State, was testifying about her medical interview of the victim when she stated, " '[the victim] gave me a really good—what I felt was a credible history.' " *Boling*, 2014 IL App (4th) 120634, ¶ 57, 8 N.E.3d 65. The State had not asked the nurse about the victim's credibility. However, this court noted that "the State was responsible for adequately preparing its witnesses to ensure that [the nurse] did not *volunteer* improper and prejudicial testimony." (Emphasis in original.) *Id.* ¶ 122, 8 N.E.3d 65 (citing *People v. Rice*, 234 Ill. App. 3d 12, 19, 599 N.E.2d 1253, 1259 (1992) ("It is axiomatic that prosecutors have a certain amount of control over their witnesses; in the instant case, the State neglected to keep [the witness's] testimony within the bounds delineated by the court.")). Similarly, in this case, the State was responsible for preparing Longfellow to ensure that he would not volunteer improper and prejudicial testimony regarding A.W.'s credibility.

¶ 127    We note that although Longfellow's testimony about what A.W. told him was inadmissible hearsay (as we discussed in the previous section of this opinion), our plain-error

- 57 -

analysis does not focus on the overall prejudicial effect of that improper hearsay testimony. Instead, we focus narrowly on Longfellow's comment that A.W. was "very believable, very credible." The question before us is whether the evidence was so closely balanced that Longfellow's improper comment on A.W.'s credibility *alone* threatened to tip the scales of justice against defendant. *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1058. We conclude that it did not.

¶ 128 Before Longfellow commented that A.W. was "very believable, very credible," the jury heard the 9-1-1 call, which occurred shortly before A.W. spoke with Longfellow. In that call, A.W. provided the 9-1-1 dispatcher with the same general report that she gave Longfellow. Namely, A.W. told the dispatcher that defendant (1) hid in A.W.'s shower and waited for her to come home, (2) grabbed A.W. by the hair and dragged her into her kitchen, (3) looked through A.W.'s cell phone, (4) took hold of a knife (or knives), (5) held A.W. against her will, (6) made A.W. disrobe, (7) forced A.W. to have sex with him twice while she was menstruating, (8) struck A.W., and (9) chased A.W. when she tried to escape. The physical evidence recovered from the scene corroborated that account. Although the jury could not visually observe A.W.'s appearance as she made the 9-1-1 call, the audio recording provided a solid foundation for the jury to make its own credibility determination as to the veracity of A.W.'s report. The 9-1-1 recording clearly revealed A.W.'s trembling voice, deep sobs, and prompt, definitive answers to the dispatcher's specific questions. A.W. sat on the witness stand, listening as that recording was played for the jury in open court. After the recording was played, A.W. testified that although she did not remember the call, she would not have "made something up" to the dispatcher.

¶ 129 The jury also learned that defendant had successfully convinced A.W. to not cooperate with the police or the State's Attorney's office. The jailhouse phone calls revealed (1)

defendant coaching A.W. on how to thwart the prosecution and (2) A.W. keeping defendant apprised of her efforts. A.W. and defendant also talked about the incident, although most of the details remained unspoken. Even after A.W. told defendant that she would help him avoid prosecution, she never said anything—either to defendant over the phone or at trial—to indicate that her initial report was untruthful. A.W. even testified at trial that although she could not remember what happened, she would not have fabricated a story to the police.

¶ 130    Although A.W.'s credibility was undoubtedly a central issue in this case, we conclude that the admissible evidence upon which the jury could have judged A.W.'s credibility was so voluminous that Longfellow's improper comment *alone* could not have threatened to tip the scales of justice against defendant. Accordingly, Longfellow's statement regarding A.W.'s credibility was not plain error.

¶ 131              b. Larimore's Comment about Defendant's Credibility

¶ 132    Regarding defendant's credibility, defendant contends that the jury should not have heard the following statements, which Detective Larimore made to defendant during the police station interview:

> "There's a couple of things that aren't making sense to me.
> Some of the things you're saying, I believe you're being honest
> about. But you are not being honest about everything.
>
> * * *
>
> I've interviewed more people than I can count, okay? And
> I've talked to people that have been 100% honest with me. I've
> been—I've talked to people that have been 0% honest with me.

Everything that came out of their mouth was a lie. And I've—most of the people that I've talked to tell some truth and some dishonesty, okay?

 *** 

For something that happened this recently, you seem to not remember anything. Every question I ask you, you're taking forever to remember."

¶ 133 Larimore clearly remarked on defendant's credibility by accusing defendant of "not being honest about everything." However, as one Illinois evidence scholar has noted, "[c]ontext is critical in the determination of whether otherwise inadmissible opinion and fact statements will be received." Michael H. Graham, Graham's Handbook of Illinois Evidence § 611.25, at 105 (Supp. 2015). Viewed in the context of the entire 42-minute police station interview in this case, we conclude that Larimore's statements to defendant were properly admitted as part of the interview recording.

¶ 134 Larimore directed his statements to the lone suspect in an ongoing criminal investigation. The jury knew that Larimore's interview with defendant took place in an interrogation room at the police station shortly after defendant had been arrested. The jury also knew that, prior to the interview, A.W. had called 9-1-1 to report that defendant entered her trailer without permission, threatened her with a knife, held her against her will, and sexually assaulted her. A.W. repeated this story to the investigating detectives, whom she walked through her trailer and showed physical evidence that appeared to corroborate her story. Based upon the information available to him, Larimore had strong reason to believe that defendant had

committed aggravated criminal sexual assault, domestic battery, unlawful restraint, and home invasion. Viewed in that context, it was hardly surprising that Larimore did not believe that defendant "was being honest about everything" when defendant initially denied any wrongdoing. Accordingly, given the context, the prejudicial effect of Larimore's statements was minimal.

¶ 135 Larimore's statements also had probative value in that they provided context for the remainder of the interview, which continued well beyond defendant's first recitation of his story. Had Larimore's statements expressing his skepticism of defendant's story simply been edited out of the interview recording, the jury would have been left wondering why Larimore continued questioning defendant about the same factual details after defendant had already provided an initial set of answers. Of course, even if Larimore's statements had been redacted, most jurors would have likely figured out that Larimore continued questioning defendant because he did not believe defendant's initial story. Defendant's version of events changed constantly throughout the interview, and his difficulty answering even the simplest of Larimore's questions was unmistakable. By the time Larimore made the statements at issue (approximately 20 minutes into the 42-minute interview), defendant's credibility was already in doubt. Defendant appeared so bewildered by Larimore's simple, straightforward questions that no reasonable juror could have thought he was "being honest about everything." (Perhaps some things, but certainly not *everything*.) Simply put, the jury did not need Larimore's statements to figure out that defendant was not telling the whole truth.

¶ 136 To the extent that Larimore's statements carried any prejudicial effect, their probative value far outweighed any prejudice. Viewed in the context of the entire 42-minute interview at issue in this case, we conclude that the inclusion of Larimore's statements in the

interview recording was not error.

¶ 137                     2. *Ineffective Assistance of Counsel*

¶ 138          Defendant also contends that his trial counsel was ineffective for failing to (1) object to Longfellow's and Larimore's statements and (2) request a limiting instruction that Larimore's statements, if admissible, could be considered only for purposes of lending context to the statements that defendant made during the interview.

¶ 139          "To show ineffective assistance of counsel, a defendant must demonstrate that 'his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' " *Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601 (quoting *People v. Patterson*, 192 Ill. 2d 93, 107, 735 N.E.2d 616, 626 (2000), citing *Strickland v. Washington,* 466 U.S. 668, 687, 695 (1984)).  "Further, in order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy."  *People v. Smith*, 195 Ill. 2d 179, 188, 745 N.E.2d 1194, 1200 (2000).

¶ 140          This court has held that "[c]laims of ineffective assistance of counsel are usually reserved for postconviction proceedings where a trial court can conduct an evidentiary hearing, hear defense counsel's reasons for any allegations of inadequate representation, and develop a complete record regarding the claim and where attorney-client privilege no longer applies."  *People v. Weeks*, 393 Ill. App. 3d 1004, 1011, 914 N.E.2d 1175, 1182 (2009) (citing *People v. Kunze*, 193 Ill. App. 3d 708, 725-26, 550 N.E.2d 284, 296 (1990)).  Based upon these considerations, we decline to reach the merits of defendant's ineffective-assistance-of-counsel claim in this direct appeal.

¶ 141                    C.  Defendant's Conviction for Home Invasion

¶ 142          Last, defendant contends that the State's evidence failed to prove him guilty of

home invasion beyond a reasonable doubt.  Specifically, defendant asserts that the State failed to

prove that he entered A.W.'s trailer "without authority" because (1) A.W. acknowledged in her

testimony that it was possible she left her door unlocked for defendant and (2) the State

presented no evidence that defendant forced entry or possessed criminal intent when he entered.

We are not persuaded.

¶ 143          Initially, we note that the offense of home invasion does not require proof of (1)

forced entry or (2) the defendant's intent at the time of entry.  See 720 ILCS 5/12-11(a)(1) (West

2010).  Proof that the defendant forced entry or had a criminal intent could serve, at most, as

circumstantial evidence of the defendant's lack of authority to enter the dwelling.  The lack of

such particular circumstantial evidence is not dispositive in this case.

¶ 144          Although defendant told Larimore during the police station interview that A.W.

invited him into her trailer, this self-serving statement was the *only* evidence to support

defendant's claim that he had authority to enter A.W.'s trailer.  Not only was defendant's

credibility virtually nonexistent, but the remaining evidence overwhelmingly supported the

conclusion that defendant entered and remained in A.W.'s trailer without authority.  A.W.'s

statements to the 9-1-1 dispatcher, her trial testimony, and the jailhouse phone calls

unambiguously revealed that defendant entered A.W.'s trailer and waited for her in the shower

stall without her knowledge or permission.  In the jailhouse calls, A.W. specifically refuted

defendant's claim that the front door of the trailer was unlocked.  (We note that although

defendant told A.W. that he entered through the unlocked front door, defendant told Larimore

that he entered through the unlocked back door after smoking a blunt on A.W.'s back porch.) Simply put, the State's evidence overwhelmingly supported defendant's conviction for home invasion.

¶ 145          D. Defendant's Retrial for Aggravated Criminal Sexual Assault
              Based Upon Anal Penetration Does Not Violate the Double Jeopardy Clause

¶ 146          For the reasons stated, we reverse defendant's conviction and sentence for aggravated criminal sexual assault based upon anal penetration, and we remand for further proceedings on that charge. In doing so, we note that the double jeopardy clause does not prohibit retrial on the anal-penetration count even though the State presented no *admissible* evidence of that offense. The supreme court has explained the pertinent rules, as follows:

"The double jeopardy clause forbids a second, or

successive, trial for the purpose of affording the prosecution

another opportunity to supply evidence it failed to muster in the

first proceeding. (*Burks v. United States* (1978), 437 U.S. 1, 11,

*** 98 S. Ct. 2141, 2147.) As this court acknowledged in *People*

*v. Mink* (1990), 141 Ill. 2d 163, 173, [565 N.E.2d 975, 979], for

purposes of double jeopardy the United States Supreme Court has

distinguished between judgments reversing convictions on account

of trial error and judgments reversing convictions on account of

evidentiary insufficiency. Reversal for trial error is a

determination that the defendant has been convicted by means of a

judicial process defective in some fundamental respect, whereas

reversal for evidentiary insufficiency occurs when the prosecution

has failed to prove its case, and the only proper remedy is a judgment of acquittal. (*Mink*, 141 Ill. 2d at 173[, 565 N.E.2d at 979].) Although the double jeopardy clause precludes the State from retrying a defendant after a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict, the double jeopardy clause does not preclude retrial of a defendant whose conviction has been set aside because of an error in the proceedings leading to the conviction. (*Mink*, 141 Ill. 2d at 173-74[, 565 N.E.2d at 979-80].) *Moreover, retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence.*" (Emphasis added.) *People v. Olivera*, 164 Ill. 2d 382, 393, 647 N.E.2d 926, 931 (1995).

¶ 147 The supreme court has reiterated these principles in subsequent decisions. See *People v. Lopez*, 229 Ill. 2d 322, 367, 892 N.E.2d 1047, 1073 (2008); *People v. McKown*, 236 Ill. 2d 278, 311, 924 N.E.2d 941, 959 (2010) ("If the evidence presented at the first trial, including the improperly admitted evidence, would have been sufficient for any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt, retrial is the proper remedy.").

¶ 148 III. CONCLUSION

¶ 149       We reverse defendant's conviction and sentence for aggravated criminal sexual assault based upon anal penetration and otherwise affirm defendant's remaining convictions and sentences in McLean County case Nos. 12-CF-891 (our case No. 4-13-0644) and 12-CF-1020 (our case No. 4-13-0650).  As part of our decision, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 150       No. 4-13-0644, Affirmed in part and reversed in part; cause remanded.

¶ 151       No. 4-13-0650, Affirmed.